JIM-BOB, INC v MEHLING

Docket Nos. 105142, 105143. Submitted March 23, 1989, at Detroit. Decided July 5, 1989. Leave to appeal applied for.

Jim-Bob, Inc., brought an action in Wayne Circuit Court for injunctive relief and damages for the alleged breach of a commercial lease of a certain property which had been owned by Charles W. Mehling and Diane L. Dawson and which was sold to The Automobile Club of Michigan. Plaintiff sought an injunction restraining defendants from evicting or otherwise interfering with plaintiff's use of the subject premises and sought damages for breach of the alleged lease, fraud and misrepresentation and tortious interference with plaintiff's contractual and business relationship. The trial court, Robert J. Columbo, J., granted a preliminary injunction prohibiting defendants from evicting plaintiff from the subject premises. Proofs at trial showed that the subject premises had been leased by Mehling and Dawson on August 25, 1978, to Luigi's Pizzeria and Cocktail Lounge for a five-year term at rent of $750 per month with the option to renew for five more years. Luigi's then sold the business to plaintiff, and, with the consent of Mehling and Dawson, the lease was assigned to plaintiff. The renewal option was not exercised in July, 1983; however, there were negotiations concerning a new five-year lease at higher rent between Mehling and plaintiff's president and manager, James P. Howell. Plaintiff began to pay higher rent in August, 1983. Mehling agreed to put a new roof on the building, which was done in the spring of 1984, and plaintiff undertook major repairs and renovations of the building's interior. In May, 1984, a $60,000 offer to purchase the building was made, which was rejected by Mehling and Dawson in June, 1984. In September or October of 1984, Mehling informed Howell of that offer, but indicated that he would sign a new lease. In late October or

REFERENCES

Am Jur 2d, Damages §§ 624 *et seq.*; Fraud and Deceit §§ 68-72; Injunctions § 322; Interference § 28; Statute of Frauds §§ 295 *et seq.*

Sufficiency of memorandum of lease agreement to satisfy the statute of frauds, as regards terms and conditions of lease. 16 ALR2d 621.

early November of 1984, Howell and Mehling met to discuss the lease. Mehling had a copy of the original lease. Howell testified that as they discussed the provision of the new lease Mehling drew lines through the obsolete provisions on the original lease, that they agreed to a new five-year lease at $850 per month, and that Mehling was paid $1,700 to cover the October and November rent. Two days later Howell received from Mehling a copy of the altered original lease. Shortly thereafter, The Automobile Club of Michigan offered to purchase the premises for $80,000, and that offer was accepted by Mehling and Dawson. Mehling then informed Howell not to spend any more money on renovations because the building had been sold. Plaintiff received on January 4, 1985, a notice to quit the premises by February 5, 1985. Plaintiff commenced its action. In July, 1985, the Auto Club agreed to pay an additional $8,800 for the building and to indemnify Mehling and Dawson against all claims by plaintiff arising out of plaintiff's tenancy of the subject property, and the sale was closed. In August or September of 1985, plaintiff removed its fixtures and abandoned the premises. A jury returned a verdict of $150,000 in favor of plaintiff, $75,000 for loss of the business and $75,000 for lost profits, and rejected the Auto Club's counterclaim for unpaid rent, damages to the premises and expenses caused by plaintiff's action. Mehling and Dawson appealed. The Auto Club appealed.

The Court of Appeals *held:*

1. The copy of the altered original lease sent by Mehling to Howell could satisfy the written memorandum requirement of the statute of frauds.

2. A jury question was presented as to whether, by altering the original lease and sending a copy of the same to Howell, Mehling thereby acknowledged or authenticated his signature on the original lease.

3. There existed a jury question as to whether defendants Mehling and Dawson were estopped from raising the statute of frauds.

4. There was evidence from which the jury could find that Mehling had represented that plaintiff would be given a long-term lease while having no then-present intent to enter into such a lease. Such a finding would support plaintiff's claim of fraudulent misrepresentation.

5. Plaintiff's seeking of the injunction to preserve the status quo did not constitute an election of remedies such as would preclude the seeking and receiving of money damages.

6. The trial court did not abuse its discretion by admitting

evidence relating to the agreement by the Auto Club to indemnify Mehling and Dawson.

7. The evidence raised a jury question as to whether the Auto Club tortiously interfered with a valid contractual leasehold interest of plaintiff.

8. Since the determination of the damages associated with plaintiff's loss of the business due to the breach of the lease was not substantially based upon loss of profits, the jury's granting of damages for both loss of the business and lost profits did not constitute a double recovery.

Affirmed.

1. FRAUDS, STATUTE OF — CONTRACTS — MEMORANDUM.

The statute of frauds requires that with respect to contracts subject to the statute some note or memorandum having substantial probative value in establishing the contract must exist if the contract is to be deemed enforceable; the sufficiency of such a memorandum in attaining the purpose of the statute of frauds depends in each case upon the setting in which it is found.

2. FRAUDS, STATUTE OF — LEASES — RENEWAL OF LEASES.

Evidence that a party raising the statute of frauds as a defense to the renewal of a lease sent to the party claiming that there existed a renewed lease a copy of the prior lease containing certain amendments raises a jury question as to whether the amended copy of the prior lease was intended to be the required written memorandum evidencing an agreement to renew the lease under the amended terms.

3. FRAUDS, STATUTE OF — SIGNED WRITING.

Any symbol executed or adopted by a party with the present intent to authenticate a writing may serve as a signature for the purpose of satisfying the statute of frauds; the adoption of a signature on an old contract to authenticate a new agreement may satisfy the signed writing requirement of the statute of frauds.

4. FRAUD — FUTURE PROMISES — BAD FAITH.

An action for fraudulent misrepresentation, as an exception to the general rule, may be predicated upon a promise made in bad faith without intention of performance, but evidence of fraudulent intent, to come within the exception, must relate to conduct of the actor at the very time of making the representations, or almost immediately thereafter.

5. ELECTION OF REMEDIES — PRELIMINARY INJUNCTIONS.

The seeking of a preliminary injunction to prohibit the sale of

real estate during the pendency of an action to determine whether there exists a leasehold interest with respect to the subject real estate does not constitute an election of remedies by the party seeking the preliminary injunction such that the party may not thereafter seek money damages for the breach of the lease.

6. TORTS — INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONSHIPS.

The fact that a defendant in an action for tortious interference with a contractual or business relationship engaged in the complained-of acts for a legitimate personal or business interest does not, per se, shield that person from liability for tortious interference.

7. DAMAGES — LOST PROFITS — LOSS OF VALUE OF BUSINESS.

It does not constitute an impermissible double recovery for a jury to award in an action based on the breach of a commercial lease both lost profits arising out of the breach of the lease and the loss of value of the business resulting from the breach of the lease where the determination of the loss of the value of the business did not significantly rest upon the loss of profits due to the breach.

*Thorpe, Patrick, Johnson & King, P.C.* (by *Paul H. Johnson, Jr.*), for plaintiff.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *George R. Ashford, Robert Powell* and *Linda S. McAlpine*), for defendants Mehling and Dawson.

*Donald K. Converse,* for defendant The Automobile Club of Michigan.

Before: BEASLEY, P.J., and GILLIS and BRENNAN, JJ.

BEASLEY, P.J. Defendants, Charles W. Mehling, Diane L. Dawson and The Automobile Club of Michigan, appeal from a judgment in the sum of $150,000 in favor of plaintiff, Jim-Bob, Inc. The judgment was entered on a jury verdict rendered

after a lengthy, five-day, trial. The jury also found for plaintiff on the counterclaim of defendant Auto Club, denying any recovery thereon.

The general facts from which the litigation arose are as follows. On August 25, 1978, defendants Mehling and Dawson leased a commercial building located at 404 Clifford in downtown Detroit to Luigi's Pizzeria and Cocktail Lounge for a five-year term, commencing on July 1, 1978, at a rental of $750 per month and with an option to renew for an additional five years. Luigi's then sold the business and, with defendants Mehling's and Dawson's consent, assigned the lease to plaintiff, Jim-Bob, Inc.

While the renewal option was not exercised, during 1983, defendant Mehling and James P. Howell, president of Jim-Bob and manager of the business, did discuss and negotiate regarding a new five-year lease at a higher rent. In fact, plaintiff began paying the higher rent in August, 1983. In December, 1983, defendant Mehling agreed to, and in the spring of 1984 did, put a new roof on the building, and plaintiff undertook major repairs and renovations of the building's interior.

In May, 1984, John Lambrecht, a real estate broker and investor, approached defendant Dawson and inquired concerning the availability of the 404 Clifford premises for purchase by his undisclosed principal. On May 18, 1984, he submitted a written offer to purchase the property on his principal's behalf for $60,000. This offer was rejected by Dawson and Mehling on June 18, 1984. In September or October of 1984, Mehling told Howell that Dawson had been approached by a prospective buyer for the building, but reassured Howell that the buyer was "just looking" and that he (Mehling) would sign a new lease.

On either October 26 or November 3, 1984 (the

testimony is in dispute), Howell met with Mehling to discuss the lease. Mehling had a copy of the original lease with him. At that time, they agreed that plaintiff would lease the 404 Clifford premises for another five-year term, with a five-year renewal option, at a rent of $850 per month. Howell gave Mehling a $1,700 check for the October and November rent. Two days later, Howell received in the mail from Mehling a copy of the old lease, with lines drawn through certain provisions.

Around the same time, Lambrecht disclosed to Dawson and Mehling that he was representing defendant Auto Club in his attempts to purchase their property. Sometime during the first week of November, Lambrecht prepared and submitted a second purchase offer to Dawson and Mehling, this time for $80,000, which was accepted by defendants Dawson and Mehling on November 8, 1984. Mehling then called Howell and told him not to spend any more money on renovations because they had sold the building. Shortly thereafter, Lambrecht contacted Howell and inquired how soon plaintiff could vacate the building. On January 4, 1985, Howell received a notice to quit the premises by February 5, 1985.

On January 11, 1985, plaintiff started the within case against defendants Mehling, Dawson and the Auto Club, seeking: an injunction restraining defendants from evicting plaintiff or otherwise interfering with plaintiff's use and enjoyment of the 404 Clifford premises both temporarily, during the pendency of the action, and permanently, through June, 1988 (the term of the alleged new lease); damages for defendants Mehling's and Dawson's alleged breach of the lease and for their alleged misrepresentation and fraud in continuing to lead plaintiff to believe they would sign a long-term lease while they were, at the same time, negotiat-

ing the sale to defendant Auto Club; and a declaratory order that plaintiff had a valid lease of the premises extended through June, 1988. After a hearing, the trial court granted plaintiff's motion for a preliminary injunction, by order dated February 19, 1985, restraining defendants from evicting plaintiff from the 404 Clifford premises.

On May 20, 1985, defendant Auto Club moved for summary disposition under MCR 2.116(C)(10), claiming that there was no genuine issue of fact, in essence contending that, because plaintiff failed to exercise its renewal option in compliance with the terms of the original lease and because there was insufficient written evidence of a new lease, plaintiff was a month-to-month tenant after June, 1983, and, therefore, could not complain that defendants Mehling and Dawson had breached the lease or that defendant Auto Club had tortiously interfered with that contractual agreement.

On June 3, 1985, plaintiff filed a cross-motion for summary disposition under MCR 2.116(C)(10), contending that in November, 1984, defendant Mehling and Howell had entered into a new, valid lease, sufficient evidence of which existed in the form of the copy of the original 1978 lease of the premises on which defendant Mehling had lined through portions the parties had agreed to change. In their response to plaintiff's cross-motion, defendants Mehling and Dawson contended that the lined-through copy of the original lease was an insufficient memorandum of a new, valid lease because certain essential terms of the agreement had been stricken. After a hearing on June 14, 1985, the trial court declined to grant either motion.

The closing on the sale of the 404 Clifford premises was not immediately performed. Apparently, defendants Mehling and Dawson were reluctant to

complete the sale during the pendency of plaintiff's suit because they were concerned about their potential liability. Consequently, on July 27, 1985, defendant Auto Club agreed to pay an additional $8,800 for the property, for a total purchase price of $88,800, and agreed to indemnify defendants Mehling and Dawson against all claims for damages by plaintiff arising out of plaintiff's tenancy in the 404 Clifford premises, whether arising before or after the sale. By letter dated July 29, 1985, defendant Auto Club informed plaintiff's counsel that it had purchased the property in question and that plaintiff should pay all future rents to it and, two weeks later, directed plaintiff to present proof of the $100,000 liquor liability and $300,000 public liability insurance coverage it was required to maintain under the terms of the lease by which plaintiff claimed possession.

In August or September, 1985, plaintiff removed the interior fixtures and abandoned the 404 Clifford premises. Thereafter, on October 18, 1985, pursuant to defendant Auto Club's motion, the trial court dissolved the preliminary injunction which it had ordered on February 19, 1985, and defendant Auto Club took possession of the 404 Clifford premises.

On March 21, 1986, the trial court granted defendant Auto Club permission to bring a counterclaim against plaintiff. On March 20, 1987, plaintiff filed an amended complaint, adding James P. Howell as a plaintiff, and alleging further facts in support of its claim of tortious interference against defendant Auto Club that involved events occurring after the entry of the February, 1985, preliminary injunction. On May 26, 1987, defendant Auto Club filed its counterclaim against plaintiff for unpaid rent and water bills, damage to the premises, conversion of the interior fixtures

and expenses incurred by defendant as a result of plaintiff's civil action and the injunction.

On October 7, 1987, defendants Mehling and Dawson moved for summary disposition under MCR 2.116(C)(10), contending that plaintiff's claim for fraudulent misrepresentation should be dismissed because defendants made no material misrepresentation upon which plaintiff reasonably relied and because defendants had no intent to defraud plaintiff. Defendants further contended that they had not breached the covenant to repair in the lease because they had caused a new roof to be put on the building as soon as plaintiff had given proper notice and because plaintiff's business was closed by the health department, rather than due to water damage from the leaking roof. On October 19, 1987, defendants Mehling and Dawson moved for summary disposition against plaintiff James P. Howell under MCR 2.116(C)(8), alleging failure to state a claim and contending that he had no standing as an individual to bring a suit against defendants.

Prior to commencement of trial, the trial court granted summary disposition to defendants Mehling and Dawson on plaintiff's claims of fraudulent misrepresentation concerning statements made before May, 1984 (the date of Lambrecht's initial purchase offer), but denied summary disposition on fraud claims arising out of alleged statements made on or after that date. The trial court also granted summary disposition to defendants Mehling and Dawson on plaintiff's claim for breach of the lease covenant to repair based on the express terms of the lease and, further, granted defendants' motion to dismiss James P. Howell from the action for lack of standing.

The trial court then denied defendants Mehling's and Dawson's motion in limine to exclude

evidence of the July 27, 1985, indemnity agreement. The court ruled that the evidence was relevant and probative of defendant Auto Club's alleged intent to tortiously interfere with the contractual relationship between defendants Mehling and Dawson and plaintiff and that any possible prejudicial effect upon the jury could be cured by a cautionary instruction.

At the close of plaintiff's proofs, all defendants moved for directed verdicts based on alleged insufficient evidence and election of remedies. The court denied Mehling's and Dawson's motion on the fraudulent misrepresentation issue. The court also ruled that because the February, 1985, injunction was not a permanent injunction and was, in fact, dissolved in October, 1985, it only served as an election of remedies to bar any claim for damages during the time in which it was in effect. Later, the trial court denied directed verdicts on the remaining issues. Additionally, the trial court denied plaintiff's motion for a directed verdict, which was based on an argument that defendants Mehling and Dawson were estopped from asserting the statute of frauds defense.

As indicated, the jury returned a verdict in favor of plaintiff on all claims, including defendant Auto Club's counterclaim, and awarded plaintiff damages in the amount of $75,000 for loss of the business and $75,000 for lost profits. Judgment was entered on November 19, 1987. On appeal, several issues are raised.

First, did the trial court err in denying defendants Mehling's and Dawson's motion for a directed verdict on the breach of lease claim? Defendants Mehling and Dawson contend that the trial court erred, as a matter of law, in denying their motion for a directed verdict on plaintiff's claim for breach of lease because there existed no writ-

ten memorandum of a lease sufficient to satisfy the statute of frauds, MCL 566.106; MSA 26.906, which provides:

> No estate or interest in lands, other than leases for a term not exceeding 1 year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing.

Additionally, MCL 566.108; MSA 26.908 provides in pertinent part:

> Every contract for the leasing for a longer period than 1 year, or for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing . . . .

In addition, defendants say Mehling had no authority to bind defendant Dawson to a new lease. Furthermore, they argue that plaintiff's reliance on defendants Mehling's and Dawson's promises to enter into a new lease was not justifiable reliance that operated to estop those defendants from asserting a statute of frauds defense.

The trial court ruled:

> In my judgment, the essential terms of the lease are established either by reference to the agreement or by undisputed fact issues as to what the terms were to be. . . .

This Court finds that there is evidence from which a jury could conclude that by going through the lease and striking some of the information and substituting other things, and by agreeing to certain essential terms and by sending the lease to the plaintiff two days later, there was an acknowledgment of the signature.

The court then went on to rule that defendant Mehling had apparent authority to enter into a lease with plaintiff on behalf of both defendant Dawson and himself, and finally concluded:

Now, whether Mr. Mehling intended this old lease after the discussions at Melio's in 1974 of November [*sic*] to be reviewed by his lawyer and then typed up into a new lease is an issue of fact, and that's clear from the Opdyke case [*Opdyke Investment Co v Norris Grain Co*, 413 Mich 354; 320 NW2d 836 (1982)] where the Michigan Supreme Court said, at page 360:

"Whether the parties intend to be bound only by a formally written and executed document is a question of fact, not a question of law; in most cases the question is properly left to the jury."

Consequently, I think it is a jury question as to whether or not Mr. Mehling and Mr. Howell on behalf of Jim-Bob, Inc. entered into a lease agreement for these premises, and I will deny the motion for a directed verdict on this issue.

The statute of frauds is an affirmative defense that is not only invoked to prevent fraudulent construction of a written contract, but also to prevent disputes over what provisions were included in an oral contract.[1] In *Opdyke Investment Co v Norris Grain Co*,[2] the Supreme Court stated:

---

[1] *Schipani v Ford Motor Co*, 102 Mich App 606, 611; 302 NW2d 307 (1981).

[2] 413 Mich 354, 367; 320 NW2d 836 (1982).

Certainly nothing in the language of the statute requires adherence to the strict "nothing in parol" rule suggested in *Gedvick* [*v Hill,* 333 Mich 689; 53 NW2d 583 (1952)]. The statute does not require the entire contract to be written; a "note or memorandum" of the full contract will suffice. See *Kerner v Hughes Tool Co,* 56 Cal App 3d 924; 128 Cal Rptr 839 (1976). Perhaps the "nothing in parol" notion resulted from combining the statute of frauds with the so-called "parol evidence rule," or rule against contradicting integrated writings. See *NAG Enterprises, Inc v All State Industries, Inc,* 407 Mich 407; 285 NW2d 770 (1979), reh den 407 Mich 1164 (1980); *Union Oil Co of California v Newton,* 397 Mich 486; 245 NW2d 11 (1976). In any event, the "nothing in parol" approach to the statute of frauds has been so dishonored in this Court that it has lost any claim to legitimacy. *Wozniak v Kuszinski,* 352 Mich 431; 90 NW2d 456 (1958); *Farah v Nickola,* 352 Mich 513; 90 NW2d 464 (1958); *Cramer v Ballard,* 315 Mich 496; 24 NW2d 80 (1946); *Goslin v Goslin,* 369 Mich 372; 120 NW2d 242 (1963); *Duke v Miller,* 355 Mich 540; 94 NW2d 819 (1959); *Goldberg v Mitchell,* 318 Mich 281; 28 NW2d 118 (1947); *Randazzo* [*v Kroenke,* 373 Mich 61; 127 NW2d 880 (1964)]. The foregoing cases establish the principle that extrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement. In the absence of extrinsic supplemental evidence, the court may infer that the parties intended a "reasonable" or "good faith" term as part of the contract.

In declining to adopt narrow and rigid rules for compliance with the statute of frauds, the Supreme Court, in *Opdyke, supra,*[3] affirmed the standard adopted in *Goslin v Goslin:*[4]

"There are few, if any, specific and uniform requirements. The statute itself prescribes none;

---

[3] *Id.* at 368.

[4] 369 Mich 372, 376; 120 NW2d 242 (1963).

and a study of the existing thousands of cases does not justify us in asserting their existence. *Some note or memorandum having substantial probative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found.* . . . That is the rule of law to be applied with intelligence and discrimination and not like a pedant playing a game of logomachy." [Emphasis added.]

The testimony of Howell, the president of plaintiff corporation and manager of the business, is that on November 3, 1984, he met with defendant Mehling at a restaurant to discuss a renewal of plaintiff's lease. Howell said that at that meeting he and Mehling negotiated a new five-year lease agreement, with an option to renew for another five years, at a rent of $850 per month. Howell said that they used the copy of the original lease as the basis for the new agreement. As they discussed all applicable provisions of the lease, Mehling drew lines through the obsolete provisions as new agreements were made. When the meeting ended, Howell understood that they had reached an agreement and had entered into a new lease. He said that Mehling never indicated that the agreement would be final only after his attorney and his sister, defendant Dawson, had approved it nor that certain provisions were still subject to change. Howell said he believed that the lined-through copy of the original lease was the new lease, except that they might have it retyped, and that two days later he received a copy of the lined-through lease in the mail.

The testimony of defendant Mehling verified the meeting with Howell at the restaurant, but contended that the meeting occurred on October 26, 1984. He agreed that he and Howell had discussed

the entire lease, page by page, agreeing on a five-year lease with a five-year option at a monthly rate of $850. However, Mehling said he drew lines through certain portions of the lease later that evening after he had returned to his apartment with the intent to bring to the attention of those persons interested in the lease "a part possibility of change, not necessary [*sic*] change, but possibility." Mehling contended that when he left the meeting he believed that the lease was "still far from being completed." Furthermore, he said that he had no authority to enter into a new lease without his sister's permission and, in any event, would not have done so without consulting his attorney.

In *Caldwell v Fox*,[5] the Supreme Court stated the standard for a grant or denial of a motion for a directed verdict:

> The jury, not the trial judge, is the trier of fact. Whenever a fact question exists, upon which reasonable persons may differ, the trial judge may not direct a verdict. Conversely, when no fact question exists, the trial judge is justified in directing a verdict. In deciding whether or not to grant a motion for a directed verdict, the trial judge must accord to the non-moving party the benefit of viewing the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the non-moving party. If the evidence, when viewed in this manner, establishes a prima facie case, the motion for a directed verdict must be denied. In *Detroit & Milwaukee R Co v Van Steinburg,* 17 Mich 99, 117 (1868), Chief Justice THOMAS M. COOLEY said:
>
> "In determining this question, we must look at the case as it appears from the plaintiff's own testimony, unqualified by any which was offered on the part of the defendants, and must concede to

---

[5] 394 Mich 401, 407; 231 NW2d 46 (1975).

him any thing which he could fairly claim upon that evidence. He had a right to ask the jury to believe the case as he presented it; and, however improbable some portions of his testimony may appear to us, we can not say that the jury might not have given it full credence. It is for them, and not for the court to compare and weigh the evidence."

When reviewing the trial court's denial of a directed verdict in favor of a defendant, we properly examine the evidence and legitimate inferences that may be drawn from that evidence in a light most favorable to the plaintiff. Here, we believe that, when the testimony is viewed in a light most favorable to plaintiff, the trial court could reasonably conclude under the *Opdyke, supra,* standard that there was a question of fact concerning whether the parties intended the lined-through copy of the original lease to be their final agreement and whether that agreement satisfied the statute of frauds. As the Supreme Court noted in *Opdyke*:[6]

Professor Corbin (1 Corbin, Contracts, § 29, pp 86-88) warns:

"We must not jump too readily to the conclusion that a contract has not been made from the fact of apparent incompleteness. People do business in a very informal fashion, using abbreviated and elliptical language. A transaction is complete when the parties mean it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact."

Whether the parties intend to be bound only by a formally written and executed final document is a question of fact, not a question of law; in most cases the question is properly left to the jury. Corbin, § 30, p 97.

---

[6] *Supra* at 360.

Additionally, defendants contend that, even assuming that the copy of the original lease as it existed was a sufficient written memorandum of the essential terms of the contract when supplemented by parol evidence, it, nevertheless, was not a valid contract because it was not actually resigned by defendants Mehling and Dawson nor were the old signatures authenticated. We believe that the trial court was correct in determining that this was a question of fact for the jury. Howell stated that, when he received the copy of the lease in the mail, he believed that they had entered into a binding agreement. Defendant Mehling said that, when he mailed the copy to Howell on the evening after the meeting, he intended to enter into a long-term lease with plaintiff. However, he said he did not believe they had reached a final agreement at that point.

Under MCL 566.108; MSA 26.908, leases in excess of one-year duration are void unless signed by the lessor. However, any symbol executed or adopted by a party with the present intent to authenticate a writing may serve as a signature,[7] and the adoption of a signature on an old contract to authenticate a new agreement may satisfy the statute's requirement.[8] Whether the party possessed the intent to authenticate is a question of fact.[9] Therefore, when conflicting testimony concerning defendant Mehling's and Howell's separate understandings of the status of the lease contract is viewed in a light most favorable to plaintiff, the trial court correctly ruled that the jury could infer that defendant Mehling's actions

[7] *Clark v Coats & Suits Unlimited,* 135 Mich App 87, 97; 352 NW2d 349 (1984).

[8] See 72 Am Jur 2d, Statute of Frauds, § 358, p 883; 37 CJS, Frauds, Statute of, § 202, p 696.

[9] *Clark, supra* at 97.

of lining through certain portions of the lease and mailing a copy of that lease to Howell constituted an acknowledgment or authentication of his original (1978) signature.[10]

Defendants also contend that defendant Mehling had no written authority to bind defendant co-owner Dawson to a new lease and that, since the applicable Michigan statute of frauds[11] requires the signature of the party making or conveying a lease or that of "some person thereunto by him lawfully authorized by writing," the lease was void. We do not agree.

A factual question existed as to whether defendants were estopped from raising the statute of frauds defense against plaintiff because plaintiff's reliance on defendant Mehling's oral agreement to enter into a new lease was reasonable and justified. In the within case, plaintiff relied on defendant Mehling's promises to enter into a long-term lease. There were an on-going series of such promises beginning at least as early as December, 1983, when defendant Mehling promised to reroof the building and renegotiate a new lease, while plaintiff promised to repair and renovate the interior and sign a long-term lease. The parties performed their promises to make repairs on the building. Both defendants Mehling and Dawson agreed that they fully intended to enter into a new lease with plaintiff and desired that plaintiff remain their tenant even during the period in which they were entertaining purchase offers by Lambrecht on behalf of his undisclosed principal. Defendant Mehling admitted that he had made such representations to plaintiff. At the same time, they knew of and acquiesced in plaintiff's renovation of the restaurant's interior to the point of reassuring

[10] See *Prigge v Olson,* 154 Neb 131; 47 NW2d 344 (1951).
[11] MCL 566.106; MSA 26.906; MCL 566.108; MSA 26.908.

plaintiff that they would enter into a lease, despite the offer from a buyer who was "just looking." Defendant Mehling testified that, as late as October 26 or November 3, depending on which party's date is accurate, he fully intended to enter into a long-term lease with plaintiff. We believe that, when the testimony presented at trial is viewed in a light most favorable to plaintiff, a question of fact was created concerning whether certain promises were made by defendants and reasonably relied upon by plaintiff. Therefore, the trial court properly submitted the estoppel question to the jury.[12]

Second, did the trial court err in denying defendants Mehling's and Dawson's motion for a directed verdict on plaintiff's claim for fraudulent misrepresentation? The trial court ruled that, when the evidence was viewed in a light most favorable to plaintiff, there was sufficient evidence presented from which the jury could reasonably infer that defendant Mehling had represented an intent to enter into a long-term lease with plaintiff and, in fact, had negotiated toward that end, with knowledge that plaintiff was renovating the premises and was relying on these representations and negotiations, while having had no then-present intent to actually consummate any such agreement.

The elements constituting actionable fraud or misrepresentation are:

"(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5)

---

[12] See *Opdyke, supra* at 370.

that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery."[13]

Fraud will not be presumed but must be proved by the plaintiff by clear, satisfactory and convincing evidence.[14] The fraudulent misrepresentation may be based on a promise made in bad faith without intent to perform. To fall within this "bad faith" exception, the evidence of fraudulent intent must relate to conduct by the actor at the time the representations are made or almost immediately thereafter.[15]

There was evidence here that defendant Mehling represented to Howell that he and Dawson would give plaintiff a long-term lease when they, in fact, had no present intent to enter into such an agreement. Viewing this evidence in a light most favorable to plaintiff, there was a question of fact for the jury. The trial court did not err in refusing to direct a verdict on this issue.

Third, when plaintiff obtained a preliminary injunction to prevent its eviction from the premises at issue, did plaintiff thereby make an election to pursue the remedy of specific performance so as to bar any damage claim against defendants? Defendants contend that the trial court erred by ruling that plaintiff, having sought and obtained a preliminary injunction, was only barred from making a claim for damages incurred from February

[13] *Dumas v Auto Club Ins Ass'n,* 168 Mich App 619, 636; 425 NW2d 480 (1988), quoting *Candler v Heigho,* 208 Mich 115, 121; 175 NW 141 (1919).

[14] *Id.* at 637.

[15] *Hi-Way Motor Co v International Harvester Co,* 398 Mich 330, 337-339; 247 NW2d 813 (1976).

19, 1985, through October 18, 1985, the duration of the preliminary injunction, but was not barred from making a claim for any damages incurred thereafter. The trial court ruled that, because the injunction was temporary and was, in fact, vacated, plaintiff was not seeking inconsistent relief by suing for damages incurred after the injunction was lifted. We agree.

The doctrine of election of remedies is merely a procedural rule which precludes a plaintiff to whom there are available two inconsistent remedies from pursuing both.[16] Its purpose is to prevent double recovery for a single injury, not to prevent recourse to alternative remedies.[17] The essential conditions or elements of election of remedies are: "(1) the existence of two or more remedies; (2) an inconsistency between the remedies; and (3) a choice of one of them."[18] The test for inconsistency of remedies was set forth in *Production Finishing Corp v Shields*,[19] as follows:

"For one proceeding to be a bar to another for inconsistency, the remedies must proceed from opposite and irreconcilable claims of right and must be so inconsistent that a party could not logically assume to follow one without renouncing the other. Two modes of redress are inconsistent if the assertion of one involves the negation or repudiation of the other. In this sense, inconsistency may arise either because one remedy must allege

---

[16] *Riverview Cooperative, Inc v The First National Bank & Trust Co of Michigan,* 417 Mich 307, 311; 337 NW2d 225 (1983).

[17] *Id.* at 312.

[18] *In the Matter of the Dissolution of F Yeager Bridge & Culvert Co,* 150 Mich App 386, 396; 389 NW2d 99 (1986); *Riverview, supra* at 313, quoting *Ielmini v Bessemer National Bank,* 298 Mich 59; 298 NW 404 (1941), which itself was quoting 18 Am Jur, Election of Remedies, § 9, pp 132-133 [now see 25 Am Jur 2d, Election of Remedies, § 8, p 652].

[19] 158 Mich App 479, 494-495; 405 NW2d 171 (1987), lv den 430 Mich 859 (1988), cert den — US —; 109 S Ct 392; 102 L Ed 2d 381 (1988), quoting 25 Am Jur 2d, Election of Remedies, § 11, pp 653-654.

as fact what the other denies, or because the theory of one must necessarily be repugnant to the other. More particularly, where the election of a remedy assumes the existence of a particular status or relation of the party to the subject matter of litigation, another remedy is inconsistent if, in order to seek it, the party must assume a different and inconsistent status or relation to the subject matter."

In *Walraven v Martin,*[20] this Court noted that traditionally a party who elects to proceed on one theory of recovery is thereafter barred from asserting any inconsistent remedy. However, this doctrine of election of remedies generally applies only when two or more inconsistent remedies are available and the plaintiff has actually chosen and pursued one to the exclusion of the others. In *Walraven,* the plaintiff sought both rescission of a contract, a remedy involving disaffirmance of the contract, and damages for fraud, which involved an affirmation of the contract. The Court held that the plaintiff had not "elected" a remedy by seeking inconsistent remedies, explaining:

Modern rules of civil procedure, the election of remedy doctrine expressed in the current legal periodicals cited earlier, and the Supreme Court's decision in *Gruskin v Fisher,* 405 Mich 51; 273 NW2d 893 (1979), lead us to conclude that plaintiff may simultaneously pursue all of his remedies against the sellers and other defendants herein regardless of legal consistency, *so long as plaintiff is not awarded double recovery.* While defendants emphasize the basic repugnance of allowing plaintiff to "blow hot and cold" at the same time, the inconsistency only involves legal theories of recovery. Under rescission plaintiff would be required to restore all benefits received and would be entitled

---

[20] 123 Mich App 342, 346-347; 333 NW2d 569 (1983).

to the purchase price of the restaurant and consequential damages, *Mock v Duke,* 20 Mich App 453; 174 NW2d 161 (1969), whereas his actual damages, which are the same regardless of which defendant committed the fraud upon him, consist of plaintiff's loss of the bargain measured by the difference between the actual value of the property and its value if it had been as represented. *Hubert v Joslin,* 285 Mich 337, 346; 280 NW 780 (1938); *Barker v Fordville Land Co,* 264 Mich 95, 96-97; 249 NW 491 (1933). There is no inconsistency in the factual basis plaintiff relies upon in support of each theory. We believe it unfair to require plaintiff to choose which theory to proceed under prior to trial since res judicata would prevent him from proceeding under his alternative theory should the first choice prove unsuccessful. We also note that defendants are adequately protected from the plaintiff's changing course in midstream by our doctrines of equitable estoppel, waiver, accord and satisfaction and res judicata.[21]

Defendants' argument that plaintiff's damage claim is barred by an election of remedies must fail. We do not believe that plaintiff made an election of remedies by seeking and obtaining a preliminary injunction. This was not, as defendants contend, an election and award of the remedy of specific performance of the alleged lease contract. Rather, it was merely a temporary injunction entered to preserve the status quo, that is, plaintiff's possession of the leasehold premises during the pendency of plaintiff's civil action seeking damages for breach, fraud and tortious interference with a contractual relationship, and specific performance of the lease. Basing a determination of plaintiff's election of remedies on the entry of a preliminary injunction forces plaintiff into the untenable position of seeking the injunction to

[21] *Id.* at 348-349.

preserve the status quo and thereby being relegated to seeking only specific performance or foregoing the injunction and risking being forced to seek damages in a situation in which the legal remedy may be inadequate. In *Walraven, supra,* this Court held that the plaintiff could pursue inconsistent remedies to a conclusion as long as he was not allowed to recover under both theories. That principle applies with equal force to the instant case.

Next, did the trial court abuse its discretion by denying defendants Mehling's and Dawson's motion in limine to exclude evidence of defendant Auto Club's agreement to indemnify them against plaintiff's claim? Defendants Mehling and Dawson contend that the trial court abused its discretion by admitting evidence of the agreement by which defendant Auto Club agreed to indemnify them against liability to plaintiff arising out of or relating to plaintiff's tenancy at the 404 Clifford premises. Defendants contend that this evidence was irrelevant and prejudicial to a degree that outweighed its probative value and could not be cured by the following cautionary instruction, which was given at the time the evidence was admitted:

> [L]et me make a cautionary instruction at this point in time. That evidence only comes in against the Automobile Club, it is not evidence that is admissible against Mehling and Dawson in this case and it only comes in for one purpose, it comes in to show whether there was an intent to interfere with the contract between Howell and the Mehlings and Dawson. It is not to be used for the purpose that in fact there is something backing up the liability or someone is responsible for the liability of Mehling and Dawson. . . .
> [A]ny possible liability of Mehling and Dawson

because that's going to be for you to determine in
this case and I did not mean to indicate that they
were liable, it's up to you to make that determina-
tion.

We do not believe that the admission of this
evidence was an abuse of the trial court's discre-
tion.

Generally, all relevant evidence is admissible.[22]
Evidence is relevant when it has any tendency to
make the existence of a fact at issue more or less
probable than it would be without that evidence.[23]
The trial court ruled that this evidence was admis-
sible since it was relevant to show defendant Auto
Club's intent to interfere with whatever contrac-
tual relationship might have existed between
plaintiff and defendants Mehling and Dawson. We
believe that the trial court correctly determined
that evidence of the indemnity agreement between
defendants Mehling and Dawson and defendant
Auto Club was a proper subject for consideration
by the jury for the limited purpose of showing
whether or not defendant Auto Club had inten-
tionally induced defendants Mehling and Dawson
to breach their lease with plaintiff. The decision to
admit this evidence was a proper exercise of the
trial court's discretion.

Fifth, did the trial court err in denying defen-
dant Auto Club's motion for a directed verdict on
plaintiff's claim for tortious interference with
plaintiff's leasehold rights? The elements of tor-
tious interference with a contractual relationship
are (1) a contract, (2) a breach, and (3) instigation
of the breach without justification by the defen-

[22] MRE 402.

[23] *De Voe v C A Hull, Inc,* 169 Mich App 569, 577; 426 NW2d 709
(1988), lv den 431 Mich 862 (1988); MRE 401.

dant.[24] The arguments on appeal focus upon the third element. In *Formall, Inc v Community National Bank of Pontiac,*[25] we stated the following with regard to the third element:

> "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another."

In view of this definition, a panel of this Court held, in *Christner v Anderson, Nietzke & Co, PC,*[26] that, where a defendant's acts are in furtherance of legitimate personal or business interests, such defendant is shielded from liability. However, the fact that certain actions are taken with the intent that they inure to the personal or pecuniary benefit of the defendant cannot, per se, in our view, weave a broad and impenetrable blanket of immunity from liability for those actions. Certainly, in nearly all cases of interference, the defendant hopes to benefit by way of a resulting advancement of its personal or business interests. But these ends do not necessarily justify the means undertaken. A defendant may not, with impunity, sabotage the contractual agreements of others, and that defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right. On the contrary, the defendant's motive is but one of several factors which must be

[24] *Woody v Tamer,* 158 Mich App 764, 773-774; 405 NW2d 213 (1987), lv den 429 Mich 896 (1988).

[25] 166 Mich App 772, 779; 421 NW2d 289 (1988), quoting *Feldman v Green,* 138 Mich App 360, 378; 360 NW2d 881 (1984), lv den 422 Mich 961 (1985).

[26] 156 Mich App 330, 348-349; 401 NW2d 641 (1986), lv gtd 430 Mich 898 (1988).

weighed in assessing the propriety of the defendant's actions. Such factors include (1) the nature of the defendant's conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference.[27]

In the within case, viewing the evidence in a light most favorable to plaintiff, a question was raised for the jury as to whether defendant Auto Club tortiously interfered with plaintiff's claimed lease agreement. As discussed *supra,* defendant's undisputed claim of a business interest motivation did not, per se, render plaintiff's proofs on the issue fatally deficient, as that was only one of several factors to be weighed in assessing the facts of the case. Evidence was presented in support of plaintiff's contention that a new five-year lease agreement was made by plaintiff and defendants Mehling and Dawson in late October or early November of 1984. After entry of the preliminary injunction and in response to the reluctance of defendants Mehling and Dawson to close on the sale of the property to defendant Auto Club, defendant Auto Club upped its purchase price by $8,800 and agreed to indemnify defendants Mehling and Dawson for any liability to plaintiff. At that point in time, defendant Auto Club clearly was aware that a then-potentially-valid five-year lease of the premises had been agreed upon by defendants Mehling and Dawson. Yet, evidence was presented indicating that defendant Auto Club had no intention of playing the role of landlord with regard to the premises. On the contrary, defendant Auto Club's stated intent was to use the premises as a drive-in claims center—a use quite clearly incon-

---

[27] See 4 Restatement Torts, 2d, § 767, pp 26-27, and comments thereto.

sistent with plaintiff's continued tenancy of the building. Viewing the factual circumstances of the case presented below in their entirety and in a light most favorable to plaintiff, we find no error in the trial court's denial of defendant Auto Club's motion for a directed verdict on plaintiff's claim of tortious interference. The matter was properly left to the jury.

Next, defendants challenge the damages awarded. All defendants argue that recovery for loss of business and for loss of profits constitutes a double recovery to the extent that the valuation of plaintiff's business incorporated profits. Defendants Mehling and Dawson also argue that the damages claimed were speculative and not proximately caused by their actions. We reject these arguments.

The jury's damage award was supported by the evidence. It is well settled that the appropriate measure of damages for breach of a contract, such as a lease, is that which would place the injured party in as good a position as it would have been in had the promised performance been rendered.[28] Under this principle, lost profits, if they arise from the breach and are properly proved, are an appropriate element of damages.[29] With regard to proofs of damages, the Supreme Court, in *Fera v Village Plaza, Inc,*[30] stated as follows:

"[W]here injury to some degree is found, we do not preclude recovery for lack of precise proof. We

[28] *Demirjian v Kurtis,* 353 Mich 619, 622; 91 NW2d 841 (1958); *Tel-Ex Plaza, Inc v Hardees Restaurants, Inc,* 76 Mich App 131, 134; 255 NW2d 794 (1977), lv den 402 Mich 832 (1977).

[29] *Body Rustproofing, Inc v Michigan Bell Telephone Co,* 149 Mich App 385, 390; 385 NW2d 797 (1986).

[30] 396 Mich 639, 648; 242 NW2d 372 (1976), reh den 397 Mich 956 (1976), quoting *Godwin v Ace Iron & Metal Co,* 376 Mich 360, 368; 137 NW2d 151 (1965).

do the best we can with what we have. We do not, 'in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances precision is unattainable.' "

Lost profits in this case were not overly speculative. A certified public accountant specializing in analytical accounting had analyzed plaintiff's business and testified that, while plaintiff's corporate tax returns reflected a combined three-year operating loss of $26,000, the business generated a positive cash flow of $24,076. Further, the CPA testified that the business could be expected to generate a net profit of $11,188 per year. This evidence was sufficient to justify submitting the issue of lost profits as a measure of damages to the jury. Further, there was evidence in support of the notion that plaintiff's damages were proximately caused by the actions of defendants Mehling and Dawson.

Moreover, while the testimony concerning the value of plaintiff's business was, in part, indirectly based upon profits, we do not believe that an award of damages for both loss of business and loss of profits gave plaintiff a double recovery in this case. A real estate agent specializing in sales of businesses like plaintiff's testified that plaintiff's business was worth approximately $80,000. In arriving at that figure, he did not specifically incorporate profits; rather, the witness testified that in forming the valuation he looked to an earlier purchase offer of $65,000, the business' location and its gross sales, purchases and rent. Arguably, in considering the latter combined factors, the real estate agent indirectly was considering something approaching a profit figure. The witness also stated that such a business "should" turn a profit equal to thirty percent of its gross sales. However, he

further testified that he had no information as to the actual profit or loss status of plaintiff's business. Thus, the witness' thirty percent return figure seems to have been, in essence, something along the lines of an industry average. It would appear that, to the extent that that figure would have implicitly played a role in the witness' valuation of any such business, it did so irrespective of that business's actual profit or loss history or expectancy. Viewed in this light, we do not believe that the valuation figure of $80,000 on plaintiff's business really included any meaningful profit component with specific regard to plaintiff's business. Accordingly, we find no improper "double recovery" for lost profits in this case.

Finally, defendants Mehling and Dawson challenge the trial court's use of a general verdict form. However, this argument is conditional upon our finding that the trial court erred in submitting either plaintiff's claim for fraudulent misrepresentation or its breach of lease claim to the jury. As discussed *supra*, we find to the contrary on those matters and, therefore, need not address defendants Mehling's and Dawson's final issue on appeal.

Affirmed.