# STATE OF MICHIGAN

# COURT OF APPEALS

---

XPERT TECHNOLOGIES, INC.,

        Plaintiff/Counter-Defendant-
        Appellee,

v

LEGACY GROUP LIGHTING, LLC, doing
business as CREATIVE LIGHTING
SOLUTIONS,

        Defendant/Counter-Plaintiff-
        Appellant.

UNPUBLISHED
May 15, 2018

No. 335202
Oakland Circuit Court
LC No. 2015-147137-CK

---

Before: BORRELLO, P.J., and SAWYER and JANSEN, JJ.

PER CURIAM.

Defendant appeals as of right the final judgment entered in favor of plaintiff. On appeal, however, defendant challenges the trial court's earlier order granting summary disposition in favor of plaintiff on plaintiff's breach of contract claim and defendant's breach of contract counterclaim. We affirm.

Defendant argues that the trial court erred when it found that the parties intended to enter a fixed three-year term contract and granted summary disposition. Specifically, defendant contends that because there is an ambiguity in the Master Services Agreement (MSA), the trial court should not have granted summary disposition. We disagree.

A motion for summary disposition under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint." *Shinn v Mich Assigned Claims Facility*, 314 Mich App 765, 768; 887 NW2d 635 (2016) (citation omitted). Decisions on such a motion are reviewed de novo. *Id*. (citation omitted).

> In evaluating a motion for summary disposition brought under Subrule (C)(10), a reviewing court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion. Summary disposition is properly granted if the proffered evidence fails to establish a genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. [*Id*.]

-1-

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 423; 864 NW2d 609 (2014) (citation and quotation marks omitted).

"We review de novo, as a question of law, the proper interpretation of a contract." *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 507; 885 NW2d 861 (2016). "Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact." *Port Huron Ed Ass'n v Port Huron Area School Dist*, 452 Mich 309, 323; 550 NW2d 228 (1996).

"Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Innovation Ventures*, 499 Mich at 507 (quotation marks and citation omitted). When interpreting a contract, "our obligation is to determine the intent of the contracting parties." *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). This Court determines "the parties' intent by examining the language of the contract according to its plain and ordinary meaning." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 174; 848 NW2d 95 (2014). "[C]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003). However, " 'a written instrument is open to explanation by parol or extrinsic evidence when it is expressed in short and incomplete terms, or is fairly susceptible of two constructions, or where the language employed is vague, uncertain, obscure, or ambiguous, and where the words of the contract must be applied to facts ascertainable only by extrinsic evidence, a resort to such evidence is necessarily permitted.' " *Id*. at 470, quoting *Edoff v Hecht*, 270 Mich 689, 695-696; 260 NW 93 (1935). The *Klapp* Court further explained the use of extrinsic evidence in interpreting a contract:

> [E]xtrinsic evidence is not the best way to determine what the parties intended. Rather, the language of the parties' contract is the best way to determine what the parties intended. However, where . . . it is not possible to determine the parties' intent from the language of their contract, the *next* best way to determine the parties' intent is to use relevant extrinsic evidence. Such evidence at least affords a way by which to ascertain the parties' intent, unlike the rule of contra proferentem, which focuses solely on the status of the parties to a contract. [*Klapp*, 468 Mich at 476 (emphasis in original).]

"A contract is ambiguous when two provisions 'irreconcilably conflict with each other,' or 'when [a term] is equally susceptible to more than a single meaning." *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). "The rule of *contra proferentum* [sic] (construction of an agreement against its drafter) is used only when there is a true ambiguity and the parties' intent cannot be discerned through all conventional means, including extrinsic evidence." *Id*. at 504 n 3, citing *Klapp*, 468 Mich at 470-471.

As the trial court held below, the MSA is ambiguous with respect to its term. Under what the parties refer to as the introductory paragraph, the MSA states that it "shall be effective for an Initial Term of 3 years," effective May 1, 2014. However, § 3.1 of the MSA provides:

**Term**.  This agreement will become effective on the Effective Date and shall continue until [plaintiff] has complied with its duties and obligations identified on Schedule A (the "Initial Term"), or a triggering event causing termination of the Agreement under section 3.2, below.  This Agreement shall automatically renew for a one year period after the Initial Term unless terminated by mutual consent upon thirty (30) days written notice, prior to the end of the Initial Term (the "Renewal Term").  All provisions of this Agreement shall apply to all Services and all periods of time in which [plaintiff] renders Services for [defendant].

"Schedule A" refers to a number of documents that contain work orders for services that plaintiff would perform for defendant, but do not contain any date for purposes of the contractual term.

An interpretation of the MSA under the introductory paragraph would result in an agreement that had a term of three years, lasting from May 1, 2014, to May 1, 2017.  On the other hand, an interpretation of the MSA in accordance with §§ 3.1 (the "Term" provision) and 3.3 (the "Early Termination" provision) would result in an agreement that "would become effective on the Effective Date and continue until [plaintiff] . . . complied with its duties and obligations on Schedule A."  Because the language of the MSA is ambiguous regarding the term of the contract, and was therefore fairly susceptible to two constructions, the MSA was open to explanation by extrinsic evidence.  *Id*. at 470.

The trial court did not err when it concluded that the extrinsic evidence demonstrated that there was no question of fact that the term of the contract was for three years and granted summary disposition on that basis.  Although defendant claims that the testimony of Dave Maciejewski, a former employee of defendant who negotiated the MSA with plaintiff, Brad Byrnes, plaintiff's owner, and Anthony Paesano, plaintiff's former attorney, conflicts with respect to the intent of the parties, we disagree.  As an initial matter, defendant fails to identify any specific statements that conflict.

> A party may not leave it to this Court to search for authority to sustain or reject its position.  An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority.  Argument must be supported by citation to appropriate authority or policy.  An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue. [*Bank of America, NA v Fidelity Nat Title Ins Co*, 316 Mich App 480, 517; 892 NW2d 467 (2016) (citations and quotation marks omitted).]

Therefore, defendant has abandoned this argument on appeal.  Nevertheless, the record belies defendant's assertion.

In his affidavit, Byrnes stated that the parties agreed that the MSA's "Initial Term" would be for three years.  Byrnes further stated that although Schedule A provided for the performance of a "one-time project involving the upgrading of the computer systems at [defendant's] facilities located in the Dominican Republic and Florida," defendant also agreed to pay plaintiff "a monthly recurring fee" for the Initial Term of three years.  Further, Paesano testified that he

believed the Initial Term was for three years. Moreover, as the trial court noted, Maciejewski's affidavit supported a finding that the term of the contract was three years. Maciejewski stated that, as Creative Lighting Solutions's president, he negotiated the MSA with Byrnes and understood and agreed to a "fixed commitment of three years for the provision of the monthly service charge, and that [defendant] would be liable for a fee equal to the monthly service fee for the remaining months on the MSA" if defendant "terminated early without cause and without giving the notice required under the MSA." On defendant's behalf, Maciejewski "agreed to the fixed term of three years in order to obtain pricing concessions from [plaintiff] which was an overall part of the bargain that [he] struck for" defendant. Maciejewski further stated that the introductory paragraph of the MSA defining the "Initial Term" as being three years represented the intent of both defendant and plaintiff to "bind [defendant] for that fixed three year period for the payment of the monthly service fees." Therefore, the extrinsic evidence demonstrates that the "Initial Term" of the MSA was for three years. Thus, the trial court did not err in concluding that there was no question of fact regarding the intent of the parties with respect to the term of the contract and granting summary disposition in plaintiff's favor.

Defendant asserts that the general reference to "Initial Term" in the introductory paragraph is "overridden by the more specific provisions" of § 3.1, and therefore, the trial court erred in granting summary disposition. We disagree.

"The settled rule regarding statutory construction is that a specific statutory provision controls over a related but more general statutory provision." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 367 n 22; 817 NW2d 504 (2012), citing *In re Haley*, 476 Mich 180, 198; 720 NW2d 246 (2006). "The same is true with regard to contract provisions." *DeFrain*, 491 Mich at 367 n 22.

Although the specific provision of § 3.1 purports to define the "Initial Term" as a time "until [plaintiff] has complied with its duties and obligations identified on Schedule A (the 'Initial Term')," those duties and obligations are open-ended and do not provide a specific end date or term for the contract. Rather, the Schedule As simply provide work orders that the parties drew up when new services were required. Paesano testified that when he created the MSA template, it included a reference to Schedule A to allow for clients to adjust the MSA according to the needs that may arise throughout a contractual agreement. Paesano intended for the client to include a specific term in Schedule A, but it appeared to Paesano that Byrnes created an ambiguity in the MSA by neglecting to include a specific term for the contract. Further, Byrnes testified that "Schedule A would be identified as any Schedule A [plaintiff] would have provided from" the point the agreement was entered, April 9, 2014, "forward." Byrnes elaborated, stating, "The reason for the term [Schedule A] . . . was designed so that way, if there [were] additions to the service through its service term, it would be referenced the same way." For example, the Schedule A dated March 17, 2014, was a work order to move servers from defendant's previous tech service company to plaintiff's facilities and perform upgrades. Moreover, there are two Schedule As dated April 9, 2014. The first Schedule A, identified as "Quote #003052," outlines services for a one-time transaction to provide defendant with new infrastructure. As Byrnes testified, this one-time transaction was completed in or "about mid-August" 2014. The second Schedule A, identified as "Quote #003064," outlines the "ongoing support" that plaintiff would provide to defendant beginning on May 1, 2014, and continuing on a monthly basis throughout the term of the MSA. Because none of the Schedule As include a

specific date for the "Initial Term" of the MSA, and appear to simply be work orders for various services to be provided by plaintiff to defendant, § 3.1 is rendered ambiguous and without meaning regarding the "Initial Term." As plaintiff points out, the introductory paragraph is more specific with regard to a term for the contract than the provision in § 3.1 that purports to define the "Initial Term." Therefore, the trial court did not err in looking to the extrinsic evidence in determining the "Initial Term," and granting summary disposition.

Defendant contends that the liquidated damages clause is unenforceable because it is a penalty and not a liquidated damages provision. We disagree.

"[W]hether a liquidated damages provision is valid and enforceable" is a question of law that is reviewed de novo. *St Clair Med, PC v Borgiel*, 270 Mich App 260, 270; 715 NW2d 914 (2006). "A liquidated damages provision is simply an agreement by the parties fixing the amount of damages in the event of a breach and is enforceable if the amount is reasonable with relation to the possible injury suffered and not unconscionable or excessive." *Id*. at 270-271. A liquidated damages provision is appropriate when actual damages are uncertain and difficult to ascertain. *Id*. at 271. "The courts are to sustain such provisions if the amount is 'reasonable with relation to the possible injury suffered' and not 'unconscionable or excessive.' " *UAW-GM Human Res Ctr v KSL Recreation Corp*, 228 Mich App 486, 508; 579 NW2d 411 (1998) (citations omitted). "To determine whether the amount stipulated as liquidated damages is reasonable, the Court looks to conditions at the time the contract was entered into, not at the time of breach of the contract. . . ." *Solomon v Dep't of State Hwys & Transp*, 131 Mich App 479, 484; 345 NW2d 717 (1984). Use of the words "penalty," "forfeit," "liquidated" or "stipulated" damages is not conclusive regarding whether a written instrument provides for liquidated damages or a penalty. *Moore v St Clair Co*, 120 Mich App 335, 340-341; 328 NW2d 47 (1982) (citations omitted).

Section 3.3, the early termination provision at issue here, states:

In the event [defendant] terminates this Agreement during the Initial Term or Renewal Term, [defendant] shall be liable for an early termination penalty fee ("Penalty Fee"). The Penalty Fee shall equal the sum of [defendant's] current monthly fee (as described in the attached, Schedule A) multiplied by the remaining months left under the Initial Term. The Penalty Fee shall be payable to [plaintiff] within thirty (30) days of termination.

Here, simply because the MSA refers to the damages provision as "Penalty Fee" does not render it an unenforceable penalty. See *id*. The "Penalty Fee" provision provides for the calculation of damages to which plaintiff was entitled should defendant prematurely terminate the MSA before plaintiff rendered its promised performance. As plaintiff recognizes, "[i]t is well settled that the appropriate measure of damages for breach of contract . . . is that which would place the injured party in as good a position as it would have been in had the promised performance been rendered." *Jim-Bob, Inc v Mehling*, 178 Mich App 71, 98; 443 NW2d 451 (1989); see also *Allison v AEW Capital Mgmt, LLP*, 481 Mich 419, 426 n 3; 751 NW2d 8 (2008). At the time the contract was entered into, the parties were unable to calculate the actual damages to which plaintiff would be entitled to should defendant breach the contract because the parties could not know the point at which defendant would breach. Therefore, the parties provided that

plaintiff's damages would be calculated using "the sum of [defendant's] current monthly fee" described in Schedule A multiplied by the remaining months left under the Initial Term. This provision appears reasonable with relation to the possible injury plaintiff would suffer if defendant terminated the contract, and therefore, does not appear to be an invalid penalty. *UAW-GM Human Res Ctr*, 228 Mich App at 508-509. Thus, the "Penalty Fee" is an enforceable liquidated damages provision and not a penalty.

Defendant contends that the liquidated damages provision in § 3.3 should be viewed as a penalty in light of § 4.1. We disagree.

In relevant part, § 4.1 states:

In the event of a breach by [plaintiff], [defendant's] damages shall be limited to [defendant's] expenses for Services provided by [plaintiff] for the preceding three (3) months. Furthermore, [defendant] agrees that any claim against [plaintiff], whether arising in tort, contract or otherwise, must be brought within six (6) months from the date the claim arose.

While § 4.1 details defendant's damages in the event that plaintiff breached the contract, § 3.3 details plaintiff's damages in the event that defendant terminated the contract early. As plaintiff points out, "parties are free to contract as they see fit." *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389, 395; 875 NW2d 234 (2015), citing *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003). Plaintiff and defendant were free to negotiate a contract in which the measure of damages was different for each party. Therefore, § 3.3 is a valid calculation of plaintiff's damages because it represents the amount that plaintiff would have received had defendant not terminated the contract early.

Defendant argues that its breach of contract claim should not have been dismissed because Czarnik's affidavit established that plaintiff breached the MSA. We disagree.

Fred Sherrerd, plaintiff's vice president of operations, stated that he had "extensive involvement with" the MSA and that defendant "never contracted for backup services on the AS400" server. Sherrerd further stated that defendant's "computer system essentially consisted of two sets of servers." The first set of servers used the Microsoft operating system, while the other server, the AS400, was manufactured by IBM and was used by defendant to runs its business software. Sherrerd stated that defendant "only contracted for backup services on the set of servers that ran Microsoft operating systems and did not contract for backup services on the AS400." Sherrerd additionally stated that plaintiff "performed the backup on the servers running the Microsoft operating system[] on a daily basis until" defendant terminated the contract. Sherrerd stated that plaintiff performed "system backups to the extent required by the" MSA. Byrnes also stated that plaintiff "provided all back-up services to the full extent required by the" MSA. Moreover, Byrnes testified that plaintiff was "purely only contracted to provide colocation services for [the AS400] server to sit and be powered up, connected to the internet and have the locations have access to it."

Defendant relies on the affidavit of Daniel Czarnik, an employee of the IT company that defendant hired after it terminated its contract with plaintiff, to support its breach of contract

claim. Although Czarnik stated that plaintiff "never performed a full system backup" on the AS400 while it was in plaintiff's care, plaintiff conceded this point because, as Sherrerd and Byrnes noted, defendant never contracted for plaintiff to perform such services on the AS400.

To the extent that defendant is arguing that plaintiff neglected to provide "24x7 Monitoring" on the AS400, as required by Schedule A, this argument is without merit. Byrnes testified that plaintiff "was purely to provide colocation services for the AS400 and support at hourly rates." Byrnes also testified that although plaintiff did not perform full backups on the AS400, it "did provide and do daily incremental backups. And even during the term that we had the server we ordered new tapes because we determined that we needed to have some fresh tapes to continue backing that server up."[1] Although Czarnik's affidavit establishes that Czarnik was unable to backup the AS400 server because a separate computer that was used to connect to the server was not operational and that plaintiff never performed a full system backup on the AS400, it did not establish that plaintiff neglected to perform "24x7 Monitoring." In fact, Czarnik's affidavit suggests that plaintiff *did* perform "24x7 Monitoring" because Czarnik stated that "[t]he procedure for daily backups performed by [plaintiff] was faulty. . . ." Even if the procedures plaintiff followed were faulty because plaintiff did not perform the daily backups "in accordance with industry best practices," plaintiff nonetheless performed daily backups, suggesting that "24x7 Monitoring" occurred.

Affirmed.

/s/ Stephen L. Borrello
/s/ David H. Sawyer
/s/ Kathleen Jansen

---

[1] The record demonstrates that there was a difference between a "full backup" and the "daily incremental backups."