SULLIVAN INDUSTRIES, INC v DOUBLE SEAL GLASS CO, INC

Docket Nos. 117593, 117623. Submitted March 11, 1991, at Detroit. Decided December 27, 1991, at 9:40 A.M. Leave to appeal sought.

Sullivan Industries, Inc., a manufacturer of doors and windows, brought an action in the Oakland Circuit Court against Double Seal Glass Co., Inc., its supplier of insulated glass units (IGUS), and Norton Company, a supplier of a sealant used by Double Seal in the manufacture of IGUS, claiming monetary losses resulting from the need to replace IGUS that had become clouded because of a loss of adhesion between the glass panes and the sealant, and alleging negligence, breach of an implied warranty of merchantability, breach of implied warranty sounding in products liability, and breach of an express warranty. In addition, Sullivan sought recovery against Double Seal for breach of an implied warranty of fitness. The express warranty claim against Norton was dismissed before trial. Following the close of Sullivan's proofs, the trial court, Norman L. Lippitt, J., dismissed Sullivan's tort-based negligence and implied warranty claims against Double Seal, finding that those claims were barred by the economic-loss doctrine, and dismissed Sullivan's claim against Norton for breach of an implied warranty of merchantability pursuant to the Uniform Commercial Code, finding that the claim was barred by a lack of privity. Following the close of all proofs, the court ruled in favor of Sullivan and against Double Seal on the theory of breach of express warranty and against Norton on the tort-based theories. Norton and Double Seal filed separate appeals and Sullivan cross appealed Double Seal's appeal. The appeals were consolidated.

The Court of Appeals *held:*

The trial court erred in refusing to dismiss the tort-based claims on the basis of the economic-loss doctrine and in dismissing the contractual claim against Norton. On remand, the trial

REFERENCES

Am Jur 2d, Evidence § 269; Products Liability §§ 632, 970.

Strict products liability: recovery for damage to product alone. 72 ALR4th 12.

court must determine whether, pursuant to the provisions of the Uniform Commercial Code, there was a breach of the implied warranty of merchantability and the damages, if any, that Sullivan may be entitled to recover against Norton on that theory. Also, the court must determine whether the fact that the glazing systems in Sullivan's wood windows did not comply with industry standards sufficiently attenuated the causal connection between any breach of an express warranty by Double Seal or breach of an implied warranty by Norton and the injuries suffered by Sullivan to bar recovery. Finally, after resolving Sullivan's warranty claim against Norton, the court must address which of the parties is entitled to mediation sanctions.

1. The economic-loss doctrine bars tort remedies where a sale of goods is involved, the only injury consists of damage to the goods themselves, and the only losses alleged are economic. Application of this judicially created doctrine does not require privity of contract between the seller and a commercial purchaser of the goods. Neither does the fact that an allegedly defective good is incorporated into the good purchased by the party bringing the action render the doctrine inapplicable. The court's refusal to apply the doctrine to Sullivan's tort-based claims against Norton was error requiring reversal.

2. The court's dismissal of the claim of breach of an implied warranty of merchantability pursuant to the Uniform Commercial Code because of a lack of privity of contract between Sullivan and Norton similarly was error, and the claim must be reinstated. On remand, the court must determine, on the record as it exists, whether Sullivan established a prima facie case of breach of the implied warranty. If the court finds that Sullivan did, it must reopen proofs to permit Norton to introduce evidence to rebut the prima facie showing. If it finds that Sullivan established its claim of breach of the warranty, the court must make a determination of damages.

3. The UCC provides for recovery of consequential damages for a loss resulting from the breach of a contract for the sale of goods where the loss is foreseeable. Consequential damages include lost profits and interest paid on loans to maintain business operations.

4. The trial court's finding that Sullivan failed to establish lost profits and loss of business as a result of the failure of the IGUs was proper. The trial court correctly rejected the testimony of Sullivan's expert witness as incredible when the witness attempted to introduce in rebuttal a new method of determining loss of profits to support his conclusion. Similarly,

the trial court correctly refused to consider the testimony offered for the first time in rebuttal concerning loss of business.

5. Because no independent tortious conduct was alleged, exemplary damages are not available.

6. A party is entitled to judgment interest even where the judgment includes, as an element of consequential damages under the UCC, interest incurred because of borrowing by a purchaser made necessary by the breach of a seller and under circumstances where the seller had reason to know of the borrowing.

7. A seller's allegation of misconduct by a buyer of goods who is seeking damages from the seller for breach of warranty pursuant to the UCC relates to the question whether the alleged misconduct sufficiently attenuated the causal connection between the seller's breach and the buyer's injuries to bar recovery.

8. The resolution of any request for mediation sanctions must be governed by the provisions of MCR 2.403(L)(3)(a)-(c).

9. Parties may limit the remedies available as a result of a breach of a contract for the sale of goods, providing that the agreement limiting the remedies is neither unconscionable nor operates to deprive a party of the substantial value of the bargain. The trial court properly found that Sullivan's remedy against Double Seal was limited to the terms of the written warranty.

Reversed in part, affirmed in part, and remanded.

1. Pʀᴏᴅᴜᴄᴛs Lɪᴀʙɪʟɪᴛʏ — Nᴇɢʟɪɢᴇɴᴄᴇ — Sᴀʟᴇ ᴏғ Gᴏᴏᴅs — Uɴɪғᴏʀᴍ Cᴏᴍᴍᴇʀᴄɪᴀʟ Cᴏᴅᴇ — Pʀɪᴠɪᴛʏ ᴏғ Cᴏɴᴛʀᴀᴄᴛ.

A complaint for damages against the manufacturer of a component incorporated into assembled goods, arising from the malfunction of the assembled goods, does not state a cause of action for negligence where there is no allegation of personal injury or damage to property other than the assembled goods themselves; the buyer's rights of recovery are those provided by the Uniform Commercial Code irrespective of the existence of vertical privity of contract between the buyer and the manufacturer of the component.

2. Eᴠɪᴅᴇɴᴄᴇ — Rᴇʙᴜᴛᴛᴀʟ.

A court may properly refuse to admit the rebuttal testimony of an expert witness where that testimony, rather than rebutting the testimony offered by the opposing party, seeks to change the expert's previous testimony to correct errors detected in the methods employed by that witness.

3. DAMAGES — EXEMPLARY DAMAGES — UNIFORM COMMERCIAL CODE
— SALE OF GOODS — BREACH OF WARRANTY.

   Exemplary damages are recoverable in an action for breach of a
   warranty under Article 2 of the Uniform Commercial Code
   only if specifically authorized by some provision in the code or
   by some other rule of law; in Michigan, exemplary damages are
   recoverable in actions for a breach of a commercial contract
   only if there is proof of tortious conduct independent of the
   breach (MCL 440.1106[1]; MSA 19.1106[1]).

*Sommers, Schwartz, Silver & Schwartz, P.C.* (by *David L. Nelson, James J. Vlasic* and *Patrick Burkett*), for the plaintiff.

*Dykema Gossett* (by *Richard J. McClear, Robert J. Franzinger* and *Patrick F. Hickey*), and *Bowditch & Dewey* (by *Michael P. Angelini* and *Vincent F. O'Rourke, Jr.*), for the Norton Company.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton* (by *Konrad D. Kohl* and *Heidi D. Hudson*), for the Double Seal Glass Co., Inc.

Before: BRENNAN, P.J., and MICHAEL J. KELLY and D. F. WALSH,* JJ.

D. F. WALSH, J. These appeals, consolidated by this Court's order, arise out of an action brought by a manufacturer of glass doors and windows against its supplier of insulated glass units (IGUs) and that supplier's supplier of polysulfide sealant, a component part used in the assembly of the IGUs. The window manufacturer alleged that defective sealant caused 14,998 IGUs to fail, resulting in catastrophic monetary losses to, and the eventual bankruptcy of, the manufacturer. Defendant Norton Company, in case No. 117593, and defendant Double Seal Glass Co., Inc., in case No. 117623,

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

appeal as of right from a February 1, 1989, final judgment of the Oakland Circuit Court in favor of plaintiff, Sullivan Industries, Inc., and against Double Seal in the amount of $86,662.53, and against Norton in the amount of $508,000. In case No. 117623, Sullivan cross appeals as of right from the February 1, 1989, judgment. We reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

I

Sullivan began manufacturing doors and windows that contained IGUs in the mid-1970s. An IGU consists of two panes of glass separated by an air space, held apart by a metal "spacer," and sealed around the perimeter by a polysulfide sealant. The sealant structurally laminates the two panes of glass together and retards the transmission of moisture or other matter into the enclosed air space. Double Seal supplied Sullivan with IGUs for installation in doors and windows manufactured by Sullivan. Norton, a formulator and manufacturer of sealants for use in the assembly of IGUs, supplied Double Seal with a polysulfide sealant under the product name "N-470" for use in Double Seal's assembly of IGUs during the period relevant to this action.

According to Sullivan, beginning in the spring of 1982, "an abnormally large number of seal failures" occurred on the IGUs purchased by Sullivan from Double Seal and incorporated into windows and doors sold by Sullivan. These seal failures manifested themselves in a loss of adhesion between the glass panes and the sealant, which in turn permitted the IGUs to delaminate and allowed moisture and other foreign substances to penetrate the air space between the glass panes. As a result,

the IGUs lost their insulating characteristics and fogged. These failures forced Sullivan to replace the affected units.

Sullivan commenced this action in 1983, seeking recovery against Double Seal under the theories of negligence, breach of implied warranty of fitness pursuant to MCL 440.2315; MSA 19.2315, breach of implied warranty of merchantability pursuant to MCL 440.2314; MSA 19.2314, breach of implied warranty sounding in products liability, and breach of express warranty. Sullivan also sought recovery against Norton under the theories of negligence, breach of implied warranty of merchantability pursuant to MCL 440.2314; MSA 19.2314, breach of implied warranty sounding in products liability, and breach of express warranty. The express warranty claim against Norton was dismissed before trial.

Following the close of Sullivan's proofs, both Double Seal and Norton moved for involuntary dismissal of Sullivan's claims pursuant to MCR 2.504(B)(2). The trial court granted the motion with regard to Sullivan's claims of tort-based negligence and breach of implied warranty against Double Seal, finding that the claims were barred by the economic-loss doctrine as set forth in *McGhee v GMC Truck & Coach Division, General Motors Corp,* 98 Mich App 495; 296 NW2d 286 (1980). The court also granted the motion with regard to Sullivan's contractual claim against Norton based on the provisions of the Uniform Commercial Code, finding that the claim was barred by a lack of privity between Sullivan and Norton.

Following the close of all proofs, the court found in favor of Sullivan and against Double Seal with respect to Sullivan's theory of breach of express warranty. The court also found in favor of Sulli-

van and against Norton with respect to Sullivan's tort-based theories. These appeals followed.

The parties raise a total of thirteen claims of error. Of these thirteen errors claimed, we find two of a sufficient magnitude to warrant reversal. We begin with a discussion of those errors.

II

We conclude that the court clearly erred in finding that Sullivan's tort-based claims against Norton were not barred by the economic-loss doctrine and, hence, in refusing to grant Norton's motion for involuntary dismissal with regard to those tort-based claims. We also conclude, as a logical corollary, that the court clearly erred in granting Norton's motion for involuntary dismissal with regard to Sullivan's claim of breach of implied warranty brought pursuant to MCL 440.2314; MSA 19.2314.

We review a decision to grant or deny a motion for involuntary dismissal under the clearly erroneous standard. The decision will not be overturned unless the evidence manifestly preponderates against the decision. *Warren v June's Mobile Home Village & Sales, Inc,* 66 Mich App 386, 389; 239 NW2d 380 (1976).

The economic-loss doctrine is a judicially created doctrine that bars all tort remedies where the suit is between an aggrieved buyer and a nonperformance seller, the injury consists of damage to the goods themselves, and the only losses alleged are economic. *McGhee,* 98 Mich App 505; *Consumers Power Co v Mississippi Valley Structural Steel Co,* 636 F Supp 1100, 1105-1106 (ED Mich, 1986); *S M Wilson & Co v Smith Int'l, Inc,* 587 F2d 1363, 1376 (CA 9, 1978). The sound reasoning underlying this doctrine was set forth in *Mid-Continent Aircraft*

*Corp v Curry Co Spraying Service, Inc,* 572 SW2d 308, 312 (Tex, 1978):

> The nature of the loss resulting from damage that a defective product has caused to itself has received the attention of several commentators. Dean Page Keeton writes:
>
> "A distinction should be made between the type of 'dangerous condition' that causes damage only to the product itself and the type that is dangerous to other property or persons. A hazardous product that has harmed something or someone can be labeled as part of the accident problem; tort law seeks to protect against this type of harm through allocation of risk. In contrast, a damaging event that harms only the product should be treated as irrelevant to policy considerations directing liability placement in tort. Consequently, if a defect causes damage limited solely to the property, recovery should be available, if at all, on a contract-warranty theory."
>
> The Uniform Commercial Code was adopted by the Legislature as a comprehensive and integrated act to facilitate the continued expansion of commercial practices. Tex Bus & Comm Code Ann § 1.102. For sales of products the above purpose is carried out by Article 2 of the Code, which supplies a complete framework of rights and remedies for transacting parties. In light of the Code's scope and purpose, its terms should not be nullified by applying strict liability when the parties have contracted otherwise. Such an expansion of strict liability would frustrate the Code's purposes of codifying the law of commercial transactions by displacing its applicability in all cases where the sale of faulty products is involved. Some losses resulting from product transactions are best covered by contract liability under the Code.

See also *McGhee,* 98 Mich App 505-506; *Consumers Power,* 636 F Supp 1103-1104.

In this case, the court refused to apply the

economic-loss doctrine to bar the prosecution of Sullivan's tort claims against Norton for two reasons. First, the court found the doctrine inapplicable because "Norton had no contractual relationship with Sullivan." Second, the court found the doctrine inapplicable because the alleged damage to the IGUs constituted damage "to property other than the subject goods." Both findings are erroneous.

**A**

In *Auto-Owners Ins Co v Chrysler Corp,* 129 Mich App 38, 42; 341 NW2d 223 (1983), two of our colleagues held that privity of contract was a prerequisite for an application of the economic-loss doctrine to bar a tort action brought by a *consumer* against a remote seller. The majority reasoned that the rationale underlying the application of the doctrine in *McGhee* was that unfairness would result if a contracting party was allowed to nullify the provisions of the UCC where the only injury is to the property purchased and is caused by the condition of that property. The majority then noted that this rationale fails when there is no contractual relationship between the parties. *Id.* Accordingly, the majority concluded:

> It thus appears that the UCC has no relevancy in a case, such as the instant case, in which a consumer brings a claim against a manufacturer for damage to its product which the consumer purchased from someone other than the manufacturer. [*Id.*]

The third member of the panel in *Auto-Owners* disagreed with both the holding of the majority and the rationale employed by the majority in reaching that holding. The dissent stated:

In *McGhee v GMC Coach & Truck Division, General Motors Corp,* 98 Mich App 495, 505; 296 NW2d 286 (1980), we held that, where a suit by an aggrieved buyer alleges injury which consists of damages to the goods themselves, the buyers' sole remedies are those which are provided in the Uniform Commercial Code. MCL 440.2313; MSA 19.2313 thru MCL 440.2315; MSA 19.2315. Although *McGhee, supra,* involved a case in which a contractual relationship existed between the plaintiff and defendant, I do not believe that the holding in *McGhee, supra,* should be limited to only those cases in which the relationship between the parties is contractual. In *Piercefield v Remington Arms Co, Inc,* 375 Mich 85, 98; 133 NW2d 129 (1965), the Supreme Court held that in a breach of warranty action it is unnecessary to establish vertical privity of contract between the manufacturer and purchaser. The rule stated in *Piercefield, supra,* applies even where the loss is solely economic. *Cova v Harley Davidson Motor Co,* 26 Mich App 602; 182 NW2d 800 (1970). The adoption of the Uniform Commercial Code did not alter those decisions. See Official UCC Comment to § 2-318; *Cova, supra.* Therefore, since the protections of the Uniform Commercial Code exist even where a remote seller is the named defendant, I am of the opinion that plaintiff's negligence claim should be barred for the reasons stated in *McGhee, supra.* [*Auto-Owners,* 129 Mich App, 43-44.]

In *Great American Ins Co v Paty's, Inc,* 154 Mich App 634, 641; 397 NW2d 853 (1986), a panel of this Court observed that "the dissent in *Auto-Owners* makes a strong argument for the proposition that a contractual relationship is unnecessary to invoke the [economic-loss doctrine]." However, the panel did not decide whether the dissent's reasoning should be adopted, because such a decision was unnecessary to resolve the issues before it. *Id.,* 642. Interestingly, Judge GILLIS, who voted in the majority in *Auto-Owners* and who sat on

the panel that decided *Great American Ins,* stated that he "would reconsider his position on this issue were it necessary to resolve the instant dispute." *Id.,* 642, n 1.

Like our colleagues in *Great American Ins,* we, too, recognize the strength of the dissent's reasoning in *Auto-Owners.* We find that reasoning persuasive, and, accordingly, we adopt it. We note that the fairness issue relied upon by the majority in *Auto-Owners* is not present when, as in this case, all parties to the transaction are commercial entities because, in transactions among such parties, one of the issues in the bargaining process is the allocation of the risk of nonperformance. *Consumers Power,* 636 F Supp 1109.

Further, we believe an application of the doctrine in purely commercial settings to be consistent with the rationale underlying the doctrine. As pointed out, tort law is concerned with "the accident problem," *Mid-Continent Aircraft,* 572 SW2d 312, and, consequently, seeks to protect against harms to other property and persons by allocating the risk of dangerous or unsafe products to the manufacturer rather than to the consumer. *A C Hoyle Co v Sperry Rand Corp,* 128 Mich App 557, 561-562; 340 NW2d 326 (1983); *Consumers Power,* 636 F Supp 1104. In contrast, commercial law is concerned with economic expectations. Commercial enterprises allocate the risk of loss due to nonperformance among themselves and pass this cost on to the consumers by way of higher prices. In this manner, commercial problems can be solved with predictable consequences. *Consumers Power,* 636 F Supp 1103, 1107-1108. The reliance on privity notions to ascertain whether tort or commercial law applies serves only to blur the distinction between, and the applicability of, commercial law and tort law to economic losses. In-

stead, a more logical and conceptually manageable approach is to determine the type of loss a plaintiff is alleging. Allegations of only economic loss do not implicate tort law concerns with product safety, but do implicate commercial law concerns with economic expectations. *Consumers Power,* 636 F Supp 1107, quoting *Sylla v Massey Ferguson, Inc,* unpublished opinion of the United States District Court for the Eastern District of Michigan, decided February 13, 1984 (Docket No. 80-30029). Accordingly, the latter concerns must govern, and

> [t]he law designed to define relationships among commercial persons and enacted by the legislature to create and limit liability between them, the Uniform Commercial Code, should be applied. In this situation, there is no rationale for the court to shift the loss between parties by going outside the Code. [*Consumers Power,* 636 F Supp 1108.]

For these reasons, the trial court clearly erred in finding that the absence of privity between Sullivan and Norton precluded an application of the economic-loss doctrine.

### B

The trial court also clearly erred in finding that the damage suffered by the IGUs constituted damage to property other than the subject goods. The UCC applies to actions arising out of transactions in goods. MCL 440.2102; MSA 19.2102. Goods are defined as "all things, (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." MCL 440.2105(1); MSA 19.2105(1).

In this case, the IGUs purchased by Sullivan were movable at the time of identification to the

sales contract and, therefore, are goods within the meaning of the UCC. The sealant used to fabricate the IGUS, as a component part of the IGUS, also is a good within the meaning of the UCC. The sealant damaged only IGUS, which were goods subject to the sales transaction. The court's finding to the contrary was clearly erroneous.

C

On the basis of our review of the law, as detailed above, and the evidentiary record, we conclude that the economic-loss doctrine bars Sullivan's tort claims against Norton. Any relief to which Sullivan may be entitled as against Norton must be obtained under the provisions of the UCC. Therefore, we set aside the court's denial of Norton's motion for involuntary dismissal of Sullivan's tort claims. For the same reasons, we vacate the court's dismissal of Sullivan's claim of implied warranty brought under the UCC and reinstate that claim. Because Sullivan presented its case in chief before Norton moved for involuntary dismissal, we remand to permit the court to determine whether, on the evidentiary record as it exists, Sullivan established a prima facie case of breach of implied warranty. If the court concludes that Sullivan established such a case, then the court shall reopen proofs to permit Norton to introduce evidence to rebut the prima facie showing, given that Norton was denied this opportunity by the court's erroneous dismissal of the warranty action. Should the court find that, after Norton's presentation of additional proofs, Sullivan has established a breach of implied warranty, then the court shall reopen proofs with regard to damages and make a determination consistent with the proofs, subject to the restrictions discussed below.

III

Damages available to a buyer as compensation for a seller's breach under the UCC "are intended to place the injured party in as good a position as he would have been in had the promised performance been rendered." *S C Gray, Inc v Ford Motor Co,* 92 Mich App 789, 810; 286 NW2d 34 (1979). These "benefit of the bargain" damages are to be liberally construed and applied. MCL 440.1106(1); MSA 19.1106(1).

MCL 440.2714; MSA 19.2714 sets forth the remedies available to a buyer for a breach with regard to accepted goods. This statute provides in pertinent part:

> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

MCL 440.2715; MSA 19.2715 defines incidental and consequential damages as follows:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty.

The difference between incidental and consequential damages was explained in *Petroleo Brasileiro, SA v Ameropan Oil Corp,* 14 UCC Rep 661, 667 (ED NY, 1974), as follows:

While the distinction between the two is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting.

Examples of consequential damages include lost profits, *Uganski v Little Giant Crane & Shovel, Inc,* 35 Mich App 88, 108-110; 192 NW2d 580 (1971); *Valley Die Cast Corp v A C W, Inc,* 25 Mich App 321, 334-336; 181 NW2d 303 (1970), and interest paid on loans taken out to maintain business operations, see *S C Gray,* 92 Mich App 811-812.

In this case, the court awarded Sullivan damages against Norton on Sullivan's tort theories. Several challenges to that damages award have been raised on appeal. We need not discuss these challenges in the tort context, given our conclu-

sion that the court erred in not dismissing the tort claims. Nevertheless, we will address these challenges because the issues raised attack rulings appropriate to an award of consequential damages under MCL 440.2715(2); MSA 19.2715(2) and, hence, may arise again on remand.

Sullivan argues that the court clearly erred in finding that Sullivan had failed to prove that it was entitled to an award for lost profits. Sullivan asserts that this erroneous conclusion was based, in part, on the court's denigration of the credibility of Sullivan's expert, Dr. David Huettner, which in turn was based on an erroneous conclusion that Huettner had not used the proper method to calculate the amount of lost profits.

Huettner testified that Sullivan sustained $1,600,000 in lost profits. The method employed by Huettner in reaching this figure involved the selection of southeast Michigan as a core market coupled with elimination from consideration of renovation and rehabilitation sales—the exact method the court found to be proper. However, Huettner's testimony to this effect did not come before the court until rebuttal, more than two months after Huettner testified on behalf of Sullivan, and after an expert for Norton had criticized Huettner's method.

Rebuttal evidence is evidence that explains, contradicts, or otherwise refutes a defendant's evidence. Its purpose is to undercut the defendant's case and not merely to confirm that of the plaintiff. *Gonzalez v Hoffman,* 9 Mich App 522, 530; 157 NW2d 475 (1968). Accordingly, a plaintiff may not introduce during rebuttal new and independent facts competent as part of his testimony in chief unless permitted to do so by the court. 75 Am Jur 2d, Trial, §§ 372-374, pp 571-573.

Here, Huettner's testimony did not undermine

the credibility or testimony of Norton's expert. Quite the contrary, Huettner's rebuttal testimony lent credibility to Norton's expert, because Huettner's testimony amounted to an admission that some of the criticisms made by Norton's expert were valid. Moreover, Huettner's testimony cannot be classified as evidence inadvertently overlooked in Sullivan's case in chief. Instead, the testimony constitutes a change in previously given testimony to correct errors detected in the expert's method, thereby strengthening a weakened case. Accordingly, Huettner's testimony constituted improper rebuttal testimony. The court acted appropriately in dismissing the testimony.

Furthermore, a review of the court's opinion reveals that its finding that Huettner relied on an incorrect core market and on incorrect comparables was but one of many reasons it found Huettner's testimony to be "inherently incredible." Other reasons centered primarily on Huettner's reliance on flawed or unverified data. Sullivan does not challenge the factual underpinnings of these other reasons. Therefore, because of the special deference this Court gives to a trial court's determination of credibility, MCR 2.613(C), we conclude that the court's finding of inherent incredibility should not be disturbed.

Absent Huettner's testimony, Sullivan failed to present evidence establishing lost profits in an ascertainable amount. Sullivan's proofs are defective in two regards. First, Sullivan presented no evidence from which the court could distinguish sales lost because of the recession in the early 1980s from sales lost because of sealant failure. Second, Sullivan presented no evidence concerning what the profit margin would have been on the lost sales. Without such evidence, any award for lost profits would have been based on mere conjec-

ture or speculation. *Bonelli v Volkswagen of America, Inc*, 166 Mich App 483, 511-512; 421 NW2d 213 (1988). An award under such circumstances would be improper, as the trial court correctly found. Accordingly, on remand, Sullivan is barred from reopening proofs on the question of lost profits.

Sullivan also argues that the court clearly erred in rejecting Sullivan's claim for loss of business and in finding that Sullivan had failed to establish that the conduct of Double Seal and Norton was a proximate cause of the destruction of Sullivan's business.

A plaintiff may recover damages for loss of business where the loss is proven. *Jim-Bob, Inc v Mehling*, 178 Mich App 71, 99-100; 443 NW2d 451 (1989). To sustain his burden of proof, the plaintiff must establish with reasonable certainty injury, a causal connection between the conduct complained of and the injury, and the appropriate compensation. *Mulholland v DEC Int'l Corp*, 432 Mich 395, 415; 443 NW2d 340 (1989); Official Comment 13 to UCC 2-314, MCL 440.2314; MSA 19.2314.

In this case, Sullivan relied on the testimony of Huettner to establish its claim for loss of business. As previously noted, the court found Huettner's testimony to lack credibility. For the reasons set forth earlier in this opinion, we will not disturb the court's finding as it relates to Huettner's credibility. Accordingly, we conclude that Sullivan failed to present any credible evidence during its case in chief establishing a causal link between the sealant failure and Sullivan's eventual bankruptcy and, hence, failed to establish a prima facie case for a loss of business.

Interestingly, it was not until rebuttal that Sullivan presented additional evidence, through the testimony of James McTevia, with regard to the

causal connection between Sullivan's bankruptcy and the sealant failure. The trial court acted properly in disregarding McTevia's testimony, however. The testimony constituted improper rebuttal testimony because it merely confirmed Sullivan's allegation; it did not serve to undercut the testimony of Norton's experts. On remand, Sullivan is barred from reopening proofs to attempt to establish its loss of business damages.

Sullivan also is barred from amending its complaint and reopening damage proofs in an attempt to secure an award of exemplary damages.

MCL 440.1106(1); MSA 19.1106(1) provides that exemplary damages may not be recovered except as specifically provided "in this act or by other rule of law." There is no specific authorization in the act for an award of exemplary damages in transactions involving a breach of warranty. See MCL 440.2714, 440.2715; MSA 19.2714, 19.2715. Exemplary damages are recoverable, therefore, only if authorized by some other rule of law.

In Michigan, the general rule is that exemplary damages are not available in an action for breach of a commercial contract. An exception exists where there is proof of tortious conduct independent of the breach. *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401, 420-421; 295 NW2d 50 (1980); *Tempo, Inc v Rapid Electric Sales & Service, Inc,* 132 Mich App 93, 106; 347 NW2d 728 (1984).

In this case, there was no independently existing tortious conduct. Accordingly, the court did not err in failing to grant Sullivan's request for exemplary damages. Sullivan may not recover exemplary damages on remand.

Finally, with regard to damages, Norton argues that the court erred in permitting Sullivan to

recover both statutory interest on the judgment and interest as a component of damages.

In order to evaluate Norton's claim, this Court must distinguish between interest paid on the total judgment as allowed under MCL 600.6013(4); MSA 27A.6013(4) and interest as an item of damages or loss that is related to a substantive claim. See *Metropolitan Transfer Station, Inc v Design Structures, Inc,* 328 NW2d 532, 535 (Iowa App, 1982). MCL 600.6013(4); MSA 27A.6013(4) allows prejudgment interest on a money judgment from the date of filing the complaint to the date of satisfaction of the judgment. See also *Matich v Modern Research Corp,* 430 Mich 1, 7; 420 NW2d 67 (1988). The purpose of an award of prejudgment interest is "to compensate the prevailing party for the expenses incurred in bringing an action and for the delay in receiving money damages." *McDaniel v Macomb Co Bd of Rd Comm'rs,* 169 Mich App 474, 477; 426 NW2d 747 (1988). However, interest as an item of damages is generally interest incurred and paid by a plaintiff as a result of additional borrowings made necessary by a defendant's breach of a contract. It is recoverable in Michigan, in addition to prejudgment interest, under general principles governing damages where the seller had reason to know of the borrowing, MCL 440.2714; MSA 19.2714; *Distco Laminating, Inc v Union Tool Corp,* 81 Mich App 612, 622; 265 NW2d 768 (1978), or where the parties could reasonably foresee the additional interest incurred as potential loss in event of the breach at the time the contract was made, *American Anodco, Inc v Reynolds Metals Co,* 743 F2d 417 (CA 6, 1984). See also *Metropolitan Transfer,* 328 NW2d 536.

Interest paid on loans taken out to maintain the business, if foreseeable, falls within the category of

consequential damages as prescribed by the UCC. See *S C Gray,* 92 Mich App 811-812.

In this case, both the law and the evidence introduced at trial support the court's conclusions that Sullivan had to borrow funds to cover cash outlays incurred as a result of replacing the IGUS and that the interest paid on such borrowings was a foreseeable result of massive seal failures. Accordingly, the court did not err in awarding Sullivan interest as a component of damages. Sullivan may recover that interest on remand.

We turn now to the remaining issues raised.

IV

Double Seal argues that the court clearly erred in finding that Double Seal was liable for a total of 14,998 failed IGUS. Double Seal asserts that if it is liable at all, it should be liable only for the failure of 14,206 IGUS. This latter figure reflects a reduction of 792 failed IGUS, the number of units by which the court reduced Norton's responsibility on the basis of a finding of comparative negligence.

Sullivan's action against Double Seal is one for breach of express warranty. To the extent that the drafters of the UCC considered a buyer's misconduct as a defense in a warranty action, they apparently conceived of it in terms of proximate cause. White & Summers, Handbook of the Law under the Uniform Commercial Code, § 11-7, p 339; Official Comment 13 to UCC 2-314, MCL 440.2314; MSA 19.2314; Official Comment 5 to UCC 2-715, MCL 440.2715; MSA 19.2715. Accordingly, on remand, the court shall determine whether the fact that "the glazing systems in Sullivan's wood windows did not comply with industry standards" sufficiently attenuated the causal connection between any breach of warranty by Double Seal and

the injuries suffered by Sullivan to bar recovery with respect to the wood windows. White & Summers, *supra,* p 336. The court shall do likewise in evaluating Sullivan's implied warranty claim against Norton.

Next, Double Seal argues that the court clearly erred in finding that, for purposes of Sullivan's claim against Double Seal, the number of IGUs that failed within five years totaled 14,998. During closing argument, Double Seal's counsel stated:

> Well, shucks. Judge, it's Plaintiff's claim that the number of defective units manufactured by Double Seal are 14,993 [sic] units. We're accepting that figure for purposes of this case.

Double Seal is bound by this concession. *Weber v Enoch C Roberts Iron Ore Co,* 270 Mich 38, 48; 258 NW 408 (1935).

Double Seal also argues that the court erred in ruling that Double Seal's request for mediation sanctions would be governed by MCR 2.403, because the case was mediated before March 1, 1985, under the 1963 court rules, and because an injustice would be worked on Double Seal by an application of MCR 2.403.

MCR 1.102 provides:

> These rules take effect on March 1, 1985. They govern all proceedings in actions brought on or after that date, and all further proceedings in actions then pending. A court may permit a pending action to proceed under the former rules if it finds that the application of these rules to that action would not be feasible or would work injustice.

Accordingly, the trial court is to apply the 1985 court rules unless there is reason to continue

applying the old rules. *Bell v Fuska,* 159 Mich App 649, 651; 406 NW2d 900 (1987). The fact that a different result could be reached under the 1985 court rules is an insufficient reason to warrant proceeding under the 1963 rules. *Davis v O'Brien,* 152 Mich App 495, 501; 393 NW2d 914 (1986). However, where a party acts, or fails to act, in reliance on the prior rules and the party's action or inaction has consequences under the new rules that were not present under the old rules, a court may continue to apply the old rules to prevent injustice. *Id.*

We conclude that the resolution of any request for mediation sanctions must be governed by the provisions of MCR 2.403(L)(3)(a)-(c) for two reasons. First, the fact that a different result might be reached under MCR 2.403 is an insufficient reason not to apply that rule. *Davis, supra.* Second, Double Seal knew that in rejecting the initial evaluation it was subjecting itself to the possibility of sanctions. It cannot be said, therefore, that Double Seal acted in reliance solely on the express language of the 1963 court rule or that Double Seal's rejection exposed it to consequences not contemplated under the old court rule. *Davis, supra.*

We also conclude that it would be premature at this juncture to consider entitlement to mediation sanctions. This question we leave to the trial court to determine, after it resolves Sullivan's warranty claim against Norton.

v

Sullivan argues that the court clearly erred in finding that Sullivan was limited in its remedy against Double Seal by the terms of the written warranty to one-for-one replacement of the defective IGUs.

MCL 440.2316; MSA 19.2316, while primarily concerned with the exclusion or modification of warranties, also provides that a seller may limit by agreement the buyer's remedies for breach of warranty pursuant to MCL 440.2718, 440.2719; MSA 19.2718, 19.2719. See also White & Summers, *supra*, § 12-8, pp 375-376. At issue in this case is MCL 440.2719; MSA 19.2719, which provides in pertinent part:

> (1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitations of damages
> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

Official Comment 1 to UCC 2-719, MCL 440.2719; MSA 19.2719, provides that any limitation imposed must provide "at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract." Additionally, Official Comment 2 to UCC 2-719 indicates that subparagraph 1(b) establishes a presumption that "clauses prescribing remedies are cumulative rather than exclusive." If the parties intend to describe an exclusive remedy under the contract, they must "clearly" do so. *Id.* Finally, if the limitations placed on the recovery are unconscionable, or fail in their essential purpose or operate to deprive either party of the substantial value of the bargain, the parties may be relieved of their stric-

tures. Official Comment 1 to UCC 2-719, MCL 440.2719; MSA 19.2719; MCL 440.2719(2), (3); MSA 19.2719(2), (3); *Kelynack v Yamaha Motor Corp, USA,* 152 Mich App 105, 111; 394 NW2d 17 (1986); *Latimer v William Mueller & Son, Inc,* 149 Mich App 620, 637; 386 NW2d 618 (1986). The seller bears the burden of establishing an agreement that limits damages. *Kunststoffwrek Alfred Huber v R J Dick, Inc,* 28 UCC Rep 1371, 1372-1373, 1377 (CA 3, 1980).

For purposes of the UCC, an agreement is defined as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade [MCL 440.1205; MSA 19.1205] or course of performance [MCL 440.2208; MSA 19.2208]."

In this case, the evidence established that Double Seal's written warranty clearly and expressly limited Sullivan's remedy to replacement of the failed IGUs; that on at least three occasions, when failure rates were greater than normal, Double Seal either voluntarily or by negotiation agreed to provide Sullivan, as remedies in addition to replacement IGUs, additional IGUs free of charge and a price concession on future purchases; that Sullivan never negotiated with Double Seal or its successor, Guardian Glass, for remedies beyond those spelled out in the written warranty in reference to the failures at issue; and that Guardian Glass, after its purchase of Double Seal, strictly and exclusively honored the terms of the written warranty and did not provide or agree to provide Sullivan with additional IGUs or give Sullivan a price concession. On this evidentiary record, we conclude that the court correctly found that Sullivan's remedy against Double Seal was limited to the terms of the written warranty.

VI

Norton argues that the court erred in failing to enter a judgment that imposed joint and several liability between Double Seal and itself. Appellate review of this issue is precluded by Norton's failure to cite any supportive authority. *Community Nat'l Bank of Pontiac v Michigan Basic Property Ins Ass'n,* 159 Mich App 510, 520-521; 407 NW2d 31 (1987).

Finally, Norton argues that the evidence adduced at trial established that its sealant exceeded industry standards and, therefore, on the facts and circumstances of this case, conclusively established that the sealant was not defective. Norton further argues that the court's finding to the contrary is clearly erroneous, as is the court's decision to impose liability on Norton under Sullivan's tort theories, which was based on this erroneous finding.

We are left with a definite and firm conviction that any finding that the sealant did not comply with industry standards is clearly erroneous. Compliance with government or industry standards, however, is merely relevant, not conclusive, evidence of whether a defendant was negligent or a product was defective. MCL 600.2946; MSA 27A.2946; *Owens v Allis-Chalmers Corp,* 414 Mich 413, 422-423; 326 NW2d 372 (1982). A product may conform to industry standards and still be shown to be defectively designed. *Id.*

We decline to explore this issue further in the context of Sullivan's tort-based claims, however, given our conclusion that the court erred in failing to dismiss those claims under the economic-loss doctrine. We do note, however, that, in the context of Sullivan's claim of breach of implied warranty,

Sullivan must show that the sealant was not of average quality within the industry and was unfit for the ordinary purposes for which such goods are used. MCL 440.2314; MSA 19.2314; *Ambassador Steel Co v Ewald Steel Co,* 33 Mich App 495, 500-504; 190 NW2d 275 (1971).

Reversed in part, affirmed in part, and remanded for proceedings consistent with this opinion.