35 F.3d 236
 24 UCC Rep.Serv.2d 850, Prod.Liab.Rep. (CCH) P 14,016
DETROIT EDISON COMPANY and Protection Mutual Insurance
Company, Plaintiffs-Appellants,
v.
NABCO, INC., f/k/a National Annealing Box Company; National
Annealing Box Company; Pittsburgh Annealing Box
Company; Vectura Group, Inc.; and
Dravo Corporation, Defendants-Appellees.
 No. 93-1122.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 8, 1994.
Decided Aug. 30, 1994.
 
 John W. Henke, III, Stark, Readan & Finnerty, Troy, MI, and Mark J. Feinberg (briefed), Lowry Barfield (argued), and Charles J. Rothstein (briefed), Zelle & Larson, Minneapolis, MN, for Detroit Edison Co. and Protection Mut. Ins. Co.
 David G. Sekerak, Beresh & Prokopp, Novi, MI, and Susan L. Brown (briefed), and John A. Kruse (argued), Harvey, Kruse, Westen & Milan, Troy, MI, for Vectura Group, Inc. and Dravo Corp.
 Before: NELSON and SILER, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 SILER, Circuit Judge.
 
 
 1
 Plaintiffs, Detroit Edison Company and its insurer Protection Mutual Insurance Company (collectively "Detroit Edison"), appeal the district court's decision granting summary judgment to Defendants, Dravo Corporation and Vectura Group, Inc. (collectively "Dravo"). Detroit Edison contends that the district court erred in deciding that Michigan's economic loss doctrine bars Detroit Edison's product liability claims.
 
 
 2
 For the following reasons, we affirm the decision of the district court.
 
 I.
 
 3
 Detroit Edison, a utility company which generates and sells electricity, operates a power generation facility in Monroe, Michigan. The Monroe facility consists of four separate power producing units. On January 30, 1986, a forty-foot section of hot reheat pipe in Unit 1 exploded. The blast injured seventeen people, damaged the pipe itself and immediately adjacent equipment, demolished the brick walls of a storage room and office more than forty feet away from the pipe, blew out windows, knocked out part of an aluminum wall, caused wall panel deformation, displaced floor plating panels, damaged hydraulic lines, wires and insulation, causing an oil fire to ignite, and blew asbestos-containing material throughout the entire plant, requiring substantial clean-up.
 
 
 4
 The Monroe facility was constructed between 1968 and 1972. Each of the four power producing units contains 800 feet of hot reheat pipe. Hot reheat pipe carries high temperature, high pressure steam. All of the hot reheat pipe was fabricated and supplied by Appellee Dravo pursuant to a purchase contract. As part of the contract, Detroit Edison specified the type of pipe it wanted and provided Dravo with drawings and specifications. The pipe was designed to carry steam at 1002 degrees Fahrenheit and 750 psi. The pipe was manufactured by NABCO, Inc.[1] and then cut and bent by Dravo to conform to Detroit Edison's specifications. Prior to installation, Detroit Edison inspected the pipe. The pipe was designed to last beyond the expected life of the power plant, or at least forty years. According to Detroit Edison, during the time the pipe was in use, it was operated under normal conditions consistent with design parameters.
 
 
 5
 Detroit Edison contends that a manufacturing defect in the forty-foot section of pipe caused the explosion. The pipe had a longitudinal seam weld, and reports prepared after the explosion indicate that a high concentration of non-metallic inclusions along the weld fusion line made that section of pipe significantly weaker than the other sections of pipe. According to the reports, prior to the explosion, a crack had formed in the pipe at the location of the seam.
 
 
 6
 In January of 1989, Detroit Edison filed a product liability action against Dravo asserting tort-based claims and seeking to recover over $20 million in damages for the cost of repairing or replacing the defective pipe and surrounding machinery, repairing other property damaged by the explosion, cleaning-up and removing the asbestos, inspecting all of the hot reheat pipe supplied by Dravo in the entire Monroe facility, and purchasing replacement power from other utilities while Unit 1 was repaired and inspected and while Units 2, 3, and 4 were operating at reduced capacity to minimize the risk of another explosion.
 
 
 7
 Dravo sought summary judgment on the grounds that the "economic loss doctrine" in Michigan precludes recovery in tort by Detroit Edison and that Detroit Edison's sole remedy was under the Uniform Commercial Code ("UCC"), M.C.L. Secs. 440.1101-.9994, which Detroit Edison failed to plead. The district court initially denied Dravo's motion on April 2, 1991, finding that Detroit Edison's tort claims were not barred by the economic loss doctrine.
 
 
 8
 While the case was still pending in the district court, the Michigan Supreme Court decided Neibarger v. Universal Cooperatives Inc., 439 Mich. 512, 486 N.W.2d 612 (1992). In light of Neibarger, Dravo brought a supplemental motion for summary judgment. The district court, applying Neibarger, determined that the economic loss doctrine barred all of Detroit Edison's tort claims and, accordingly, granted Dravo summary judgment.
 
 II.
 
 9
 On appeal, a district court's summary judgment determination is reviewed de novo. Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Summary judgment is proper where, upon viewing all facts and inferences in the light most favorable to the nonmoving party, White v. Turfway Park Racing Ass'n, Inc., 909 F.2d 941, 943 (6th Cir.1990), there exists "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c).
 
 
 10
 The parties agree that Michigan law controls the dispute. As a court hearing a case in diversity, we must decide the issues based on the controlling decisions of the Michigan Supreme Court, where extant. Monette v. AM-7-7 Baking Co., 929 F.2d 276, 280 (6th Cir.1991).
 
 III.
 
 11
 A. Michigan's Economic Loss Doctrine.
 
 
 12
 Detroit Edison's appeal raises questions as to the proper scope and application of tort and contract theories of recovery. Tort law " 'protect[s] society's interest in freedom from harm.' " Neibarger, 486 N.W.2d at 615 (quoting Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555, 489 A.2d 660, 672 (1985)). Products liability law, a specific branch of tort law, is designed to protect society from the dangers of unsafe products. Theuerkauf v. United Vaccines Div. of Harlan Sprague Dawley, Inc., 821 F.Supp. 1238, 1240 (W.D.Mich.1993); see also East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866, 106 S.Ct. 2295, 2299-2300, 90 L.Ed.2d 865 (1986). By comparison, contract law reflects " 'society's interest in the performance of promises.' " Neibarger, 486 N.W.2d at 615 (quoting Spring Motors, 489 A.2d at 672). The essence of contract law is the bargain: parties of equivalent bargaining power negotiate the terms of the transaction and each is then entitled to the benefit of the bargain. Recovery in tort seeks to restore the plaintiff to where he was before the defendant's wrongful conduct injured him, whereas contract law seeks to put the plaintiff where he would be had the defendant properly performed his duty under the contract. Neibarger, 486 N.W.2d at 615.
 
 
 13
 Tort and contract law normally occupy distinct spheres. Tort law, and products liability law specifically, governs the relationship between a consumer and a manufacturer, where it is impractical or impossible for the parties to negotiate either the terms of a sale or each party's duty to the other. In this context, product liability law places a burden on the manufacturer--the party in the better position to avoid the harm of a defective product--to produce a safe product. In contrast, contract law applies to commercial transactions, where the terms and conditions of a transaction can be negotiated to each party's satisfaction. Contract law operates on the premise that commercial actors, because of their ability to bargain for the terms of the sale, will be able to allocate the risks and costs of a product's potential nonperformance.
 
 
 14
 The distinction between tort and contract becomes problematic when, as in the present case, a commercial buyer seeks to recover in tort for damages caused by a defective product which was purchased in a commercial setting. In pursuing such recovery, the buyer asks for more than the benefit of the bargain; the buyer wants to be put back where he was before the product failed. In this situation, the economic loss doctrine defines the boundary between what a buyer in a commercial setting can and cannot seek to recover in tort. "The economic-loss doctrine is a judicially created doctrine that bars all tort remedies where the suit is between an aggrieved buyer and a nonperform[ing] seller, ... and the only losses alleged are economic." Sullivan Indus., Inc. v. Double Seal Glass Co., Inc., 192 Mich.App. 333, 480 N.W.2d 623, 627 (1991). The buyer's remedy for "economic losses" is thereby limited to contract law. Neibarger, 486 N.W.2d at 613. The Michigan Court of Appeals, for several years, has recognized the economic loss doctrine. See Sullivan Indus., 480 N.W.2d at 627; Great American Ins. Co. v. Paty's, Inc., 154 Mich.App. 634, 397 N.W.2d 853, 855 (1986), appeal denied, 428 Mich. 874, 402 N.W.2d 467 (1987); A.C. Hoyle Co. v. Sperry Rand Corp., 128 Mich.App. 557, 340 N.W.2d 326, 328-29 (1983); McGhee v. GMC Truck & Coach Div., 98 Mich.App. 495, 296 N.W.2d 286, 291-92 (1980). See also Frey Dairy v. A.O. Smith Harvestore Prods., Inc., 680 F.Supp. 253, 256 (E.D.Mich.1988) (applying Michigan law), aff'd on other grounds, 886 F.2d 128 (6th Cir.1989); Eaton Corp. v. Magnavox Co., 581 F.Supp. 1514, 1537 (E.D.Mich.1984) (same).
 
 
 15
 Prior to Neibarger, the Michigan Court of Appeals, in applying the economic loss doctrine, generally considered economic losses to be those losses stemming from the damage to the product itself, such as the cost of repairing the product and lost profits resulting from the product's failure. Sullivan Indus., 480 N.W.2d at 627; A.C. Hoyle, 340 N.W.2d at 328; McGhee, 296 N.W.2d at 291. The rationale behind this definition of economic loss is that losses based on damage to the product itself are the sort of losses that can and should be addressed by the parties in negotiating the conditions and specifications of a sale. A.C. Hoyle, 340 N.W.2d at 328; see also East River Steamship, 476 U.S. at 868, 106 S.Ct. at 2300 ("[T]he injury suffered--the failure of the product to function properly--is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain."). Rational economic actors bargaining at arms length, in deciding both the extent of the seller's liabilities and the purchase price, should consider the possibility that the product will not perform properly: the buyer may insist on additional warranties to cover such a contingency, or the buyer may decide to assume a greater degree of the risk of such failure in exchange for a lower purchase price from the seller. As a result, the buyer or the seller or both will then spread the cost of this contingency out, as a cost of doing business, in the form of higher prices. See Sullivan Indus., 480 N.W.2d at 629.
 
 
 16
 As a component of defining economic losses as those losses directly related to the damage to the product itself, the Michigan Court of Appeals has previously (i.e., prior to Neibarger ) recognized an exception to the economic loss doctrine for damage to other property or persons. McGhee, 296 N.W.2d at 291-92; see also Eaton Corp., 581 F.Supp. at 1538.[2] The justification for an exception to the economic loss doctrine based on the extent and type of damage caused by a defective product appears to be that, once a defective product has caused damage to persons or other property, the product, in effect, becomes a hazardous product and constitutes the sort of harm that tort law seeks to protect against. McGhee, 296 N.W.2d at 292; see also East River Steamship, 476 U.S. at 867, 106 S.Ct. at 2300.
 
 
 17
 B. The Neibarger Decision.
 
 
 18
 The Michigan Supreme Court did not address the economic loss doctrine until its 1992 decision in Neibarger. In Neibarger, the court explicitly adopted the economic loss doctrine, holding that "where a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC." 486 N.W.2d at 618. The UCC, M.C.L. Secs. 440.1101-.9994, establishes a set of unified, coherent standards controlling commercial transactions; Article 2 of the UCC addresses the sale of goods. When a product does not live up to the requirements of the sales contract, the UCC enables a purchaser to recover on the basis of implied warranties of fitness and merchantability, as well as on any express warranties created between the parties. M.C.L. Secs. 440.2313-.2315.
 
 
 19
 Thus, under the [UCC], the purchaser of defective goods may recover the benefit of the bargain (the difference between the value of the goods as delivered and the value the goods would have had they complied with the warrant[ies] as well as incidental and consequential damages in a proper case.
 
 
 20
 Neibarger, 486 N.W.2d at 615; see also M.C.L. Secs. 440.2725, 440.2715.
 
 
 21
 The Neibarger decision's pronouncement on the economic loss doctrine brought the validity and scope of the "other property" exception, under Michigan law, into question. Neibarger involved two separate Michigan actions with virtually identical facts. The plaintiffs, dairy farmers, purchased milking systems designed by the defendants. After a period of time, some of plaintiffs' herds became ill and died, some had to be sold for beef because of nonproductivity, and others experienced health problems resulting in a reduction in milk production; additionally, there were instances of unacceptably high bacteria counts in the milk. Neibarger, 486 N.W.2d at 613-14. According to the plaintiffs, these losses were caused by design and installation defects in the milking system. The plaintiffs then brought suit in state court against defendants, alleging various theories of recovery, including negligence. The trial courts granted defendants' motions for summary judgment, finding that the transactions involved the commercial sale of goods and that the damages sought were for purely economic losses; as a result, the courts concluded that the plaintiffs' tort claims were barred by the economic loss doctrine.
 
 
 22
 The Michigan Supreme Court affirmed. In its opinion, the court expressly adopted the economic loss doctrine, determining that, in the commercial context, contract law and the UCC provided the proper remedy for economic losses resulting from a defective product. Id. at 618. Turning to the specific facts of the case, the court decided that recovery in tort was barred because, while the plaintiffs were asserting "damage to property other than the goods themselves," all of the claimed damages nevertheless constituted economic losses. Id. at 619. In so classifying the plaintiffs' losses, the court stated:
 
 
 23
 The proper approach requires consideration of the underlying policies of tort and contract law as well as the nature of the damages. The essence of a warranty action under the UCC is that the product was not of the quality expected by the buyer or promised by the seller. The standard of quality must be defined by the purpose of the product, the uses for which it was intended, and the agreement of the parties. In many cases, failure of the product to perform as expected will necessarily cause damage to other property; such damage is often not beyond the contemplation of the parties.
 
 
 24
 Id. at 620 (citations omitted) (emphasis added).
 
 
 25
 The supreme court found that the health problems plaintiffs attributed to the defective milking system were common in dairy herds and that plaintiffs were aware that milking systems could cause such problems. Additionally, the court noted deposition testimony to the effect that replacing a portion of a herd each year was a "normal part of the dairy business." Id. at 620-21. As a result, the court found that the plaintiffs made business decisions to purchase the milking systems with the knowledge that certain problems and attendant decreases in productivity were a possibility; the court then concluded that the damages alleged by plaintiffs were "lost profits and consequential damages, losses which are compensable under the UCC."[3] Id. at 621.
 
 
 26
 The rule that emerges from Neibarger significantly narrows the "other property" exception while expanding the definition of economic loss. Under Neibarger, tort claims for damage to other property are barred by the economic loss doctrine if those losses are direct and consequential losses that were within the contemplation of the parties and that, therefore, could have been the subject of negotiations between the parties. Id. at 620.
 
 IV.
 
 27
 Having examined the state of the law under Neibarger and the rationales driving the economic loss doctrine, we now turn to the facts of the present case.
 
 
 28
 In reconsidering Dravo's summary judgment motion in light of Neibarger, the district court granted Dravo summary judgment, holding that
 
 
 29
 Edison made particular business decisions, including designing and creating their specifications for the manufacture of the pipe. When the pipe did not perform according to Edison's commercial expectations, much damage occurred. However, given the nature of the use of the pipe, the damage was a consequence of the pipe's malfunction and would have been contemplated by the parties. Further, the cost of the damage could have been provided for in the contract. [Detroit Edison's] complaint may only be viewed as seeking damages for economic losses covered by UCC provisions.
 
 
 30
 Detroit Edison, relying on a distinction between "disaster and mere commercial disappointment," contends that its tort claims should not be barred. Detroit Edison asserts that the explosion at the Monroe facility was a "calamitous," unforeseeable disaster that falls within the purview of tort law. However, we find no error in the district court's judgment.
 
 
 31
 We recognize that the extent of the damage--both to property and persons--suggests a hazardous product and, therefore, implicates concerns addressed by tort law. See Miller v. United States Steel Corp., 902 F.2d 573, 574 (7th Cir.1990) ("Products liability law has evolved into a specialized branch of tort law for use in cases in which a defective product caused, not the usual commercial loss, but a personal injury to a consumer or bystander.") (emphasis added). However, the approach adopted by Neibarger focusses our inquiry not so much on the magnitude or extent of the damage as on the parties involved and the nature of the product's use. Both parties in this case are sophisticated commercial entities of equivalent bargaining power; they were in a position to fully negotiate, before the fact, the issue of potential liability. In that manner, Detroit Edison and Dravo, with the warranties provided by the UCC as a baseline, could have considered the costs to each of bearing the risk of a defective product and allocated between them, with certainty, the costs of such risk. The parties could have then passed on their respective costs, as a cost of doing business, and "thus spread [the burden] over a broad commercial stream." A.C. Hoyle, 340 N.W.2d at 329 (citation omitted).
 
 
 32
 The operation of a power plant is a business that has certain built-in hazards. Pipes will eventually deteriorate and require replacement, and it is foreseeable that pipes, such as the one that ruptured at the Monroe facility, that convey steam at high temperatures and high pressures could explode upon failure. The consequences of these inherent hazards were not beyond Detroit Edison's contemplation and Detroit Edison should have internalized some of the cost of the risks attendant to doing business. For these reasons, it would be inconsistent with Neibarger to allow Detroit Edison to use tort law to shift onto Dravo the entire burden of the risk associated with the defective product. Additionally, allowing Detroit Edison's claims would cut against the " 'essence of the Uniform Commercial Code: a complete and independent statutory scheme enacted for the governance of all commercial transactions.' " Neibarger, 486 N.W.2d at 620 (citation omitted).
 
 
 33
 In light of the inquiry set out in Neibarger, the damages that Detroit Edison seeks are economic losses. Accordingly, the economic loss doctrine bars any tort claims by Detroit Edison.
 
 
 34
 Our decision today explicitly rejects the approach taken by the district court in Citizens Ins. Co. v. Proctor & Schwartz, 802 F.Supp. 133 (W.D.Mich.1992), aff'd on other grounds, 15 F.3d 558 (6th Cir.1994). The parties in Citizens had entered into a commercial sales contract for the plaintiff to purchase a peanut roaster and conveyor cleaner from the defendant; the peanut roaster failed, causing a fire that damaged the product itself as well as other property belonging to the plaintiff. The district court, ruling on a summary judgment motion, found that the economic loss doctrine barred the plaintiff's tort claims for losses resulting from damage to the defective product but found that the economic loss doctrine did not preclude the plaintiff's tort claims for losses resulting from fire damage to "other property." Citizens, 802 F.Supp. at 142. We affirmed the district court's decision, though we explicitly expressed no view as to the validity of the district court's ruling on the economic loss doctrine. Citizens, 15 F.3d at 558-59. The "compromise" position of the district court in Citizens Insurance, like the prior position of the Michigan Court of Appeals, by applying the economic loss doctrine while still allowing some recovery in tort (recovery which could be substantial), eviscerates both the effect of Neibarger as well as the policies underlying the economic loss doctrine.
 
 
 35
 Finally, Detroit Edison urges this court to make a factual distinction between Neibarger and the present case. However, our approach requires neither reliance on nor distinction from the facts of Neibarger. The aspect of the Neibarger decision that is dispositive of the present case is definition of economic loss. The Neibarger decision's interpretation of economic loss significantly curtails the applicability of the "other property" exception to the economic loss doctrine, while expanding the meaning of "economic loss." Therefore, we believe that the Michigan Supreme Court, considering its decision in Neibarger and the stated policies underlying that decision, would bar Detroit Edison's tort claims and find that Dravo is entitled to judgment as a matter of law.
 
 
 36
 The decision of the district court granting Dravo summary judgment is AFFIRMED.
 
 
 
 [1]
 NABCO is no longer a party to the action; Dravo and Vectura are the only remaining parties
 
 
 [2]
 Note, however, that those cases cited, while recognizing the "other property" exception to the economic loss doctrine, have, nevertheless, found the economic loss doctrine applicable on the grounds that the plaintiffs had pleaded only losses based on damage to the product itself. See Sullivan Indus., 480 N.W.2d at 629-30; Great American, 397 N.W.2d at 857; A.C. Hoyle, 340 N.W.2d at 328; McGhee, 296 N.W.2d at 291
 
 
 [3]
 Note, however, that the court found plaintiffs' claims barred by the UCC's four-year statute of limitations (M.C.L. Sec. 440.2725). Neibarger, 486 N.W.2d at 621